UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re RENEWABLE ENERGY GROUP SECURITIES LITIGATION | No. 1:21-cv-1832-DLC <br><br> CLASS ACTION <br><br> JURY TRIAL DEMANDED |
| This Document Relates To: <br><br> ALL ACTIONS | |

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**TABLE OF CONTENTS**

I.      SUMMARY OF THE ACTION .................................................................................. 1

II.     JURISDICTION AND VENUE ................................................................................ 8

III.    PARTIES ................................................................................................................... 9

IV.     SUBSTANTIVE ALLEGATIONS ........................................................................ 12

        A.  Relevant Background Concerning Renewable Energy. ............................... 12

        B.  The BTC Is Critical to the Biodiesel Industry and Renewable Energy. .................... 14

        C.  Defendants Knew How Important the BTC was to the Company's Financial
            Success and Actively Sought to Maximize BTC Revenue Throughout the Class
            Period. ......................................................................................................... 15

        D.  Defendants Failed to Ensure that the Company's Internal Controls over Financial
            Reporting Were Effective. ........................................................................... 22

            1.  Renewable Energy did not have adequate processes and procedures in place
                to ensure that its guidance model did not contain calculation errors. ................... 22

            2.  Renewable Energy did not have adequate processes and procedures in place
                to ensure that biodiesel was being properly blended in order to qualify for
                the BTC ............................................................................................. 23

            3.  Renewable Energy did not have adequate processes and procedures in place to
                ensure that its BTC claims were supported by the inventory in its plants. ........... 24

        E.  Renewable Energy's Financial Statements Violated Relevant Accounting Policies
            and Principles. ............................................................................................. 26

            1.  GAAP Requirements Generally ......................................................... 26

            2.  Materiality ......................................................................................... 27

            3.  Accounting Standards Governing Restatements ................................ 27

            4.  Relevant Internal Control Standards ................................................. 28

V.      MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS
        AND OMISSIONS ................................................................................................. 30

VI.     THE TRUTH EMERGES ....................................................................................... 73

VII.    LOSS CAUSATION ............................................................................................... 80

VIII.   PRESUMPTION OF RELIANCE – FRAUD ON THE MARKET ................................ 81

IX.     INAPPLICABILITY OF SAFE HARBOR ............................................................ 82

X.      CLASS ALLEGATIONS ....................................................................................... 83

XI.     CLAIMS FOR RELIEF .......................................................................................... 84

COUNT I .......................................................................................................................... 84

COUNT II ........................................................................................................................ 88

XII.    PRAYER FOR RELIEF ................................................................................................ 90

XIII.   JURY TRIAL DEMANDED.......................................................................................... 90

Lead Plaintiff Steven Rosa ("Plaintiff"), by his attorneys, on behalf of himself and all others similarly situated, makes these allegations against Renewable Energy Group, Inc. ("Renewable Energy" or the "Company"), Randolph L. Howard ("Howard"), Cynthia J. Warner ("Warner"), Chad Stone ("Stone"), and Todd Robinson ("Robinson") (collectively, "Defendants") based upon personal knowledge as to his own acts and on information and belief as to all other matters. Plaintiff bases this information and belief on, among other things, the investigation conducted by counsel, which includes a review and analysis of: United States ("U.S.") Securities and Exchange Commission ("SEC") filings by Renewable Energy; press releases, analyst reports, public statements, news articles and other publications disseminated by or concerning Renewable Energy; independent interviews with former Renewable Energy employees conducted by investigators on behalf of Plaintiff; and other publicly available information. Counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to Defendants or are exclusively within their custody or control. Plaintiff's investigation indicates substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    SUMMARY OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities that purchased or otherwise acquired Renewable Energy securities between March 8, 2018 and February 25, 2021, inclusive (the "Class Period"), seeking to recover compensable damages caused by Defendants' violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (the "Class").

2.      Renewable Energy, purportedly "the leading U.S. advanced biofuel refinery," claims to excel at producing biodiesel[1] and mixing, tracking, and selling biofuel. As a key component of its business, Renewable Energy capitalizes on Biodiesel Mixture Excise Tax Credits, a.k.a. blender's credits, ("BTCs"), a $1.00 excise tax credit paid by the federal government for each gallon of blended fuel produced by the Company. To earn the BTC, a company must blend pure biodiesel ("B100") with petroleum diesel to yield a mix that contains at least 0.1% petroleum diesel ("B99.9"). The company is entitled to the BTC after either using that B99.9 or selling it to a third-party. If a company's BTCs exceed its tax liability, the federal government pays the overage to the company. Accordingly, Renewable Energy earns substantial revenue and, thus, income from the BTC. Indeed, going into the Class Period, the Company had not yet proven that it could make a profit without the BTC.

3.      But the BTC exists within a dynamic regulatory framework that poses unique risks requiring biodiesel companies like Renewable Energy to operate with specialized sophistication. Since creating the tax credit in 2005, Congress has allowed the BTC legislation to lapse multiple times. Each time, Congress has eventually reinstated the BTC retroactively—including 5 retroactive reinstatements since 2011—but until each reinstatement, biodiesel industry participants face uncertainty as to whether, when, and on what terms the BTC will be available.

4.      Because of that unpredictable regulatory environment—involving multiyear lapses and sudden retroactive renewals—Renewable Energy must maintain proper controls over operations and accounting. During lapses, Renewable Energy must adapt its operations to weather

---

[1] Biodiesel is made from renewable resources that are largely plant-based, with their energy coming from the sun instead of fossil fuels. These feedstocks are diverted waste or byproducts from other industries like distillers' corn and used cooking oils, inedible animal fats, as well as soybean and canola oils.

an indefinite period of net losses, as well uncertainty as to whether and when the BTC, and profitability, will return. The Company must also prepare to make the required showing—*e.g.*, proof of the precise gallons of B99.9 created and then used or sold—to the IRS as soon as a BTC reinstatement occurs. Accordingly, Renewable Energy must properly and precisely blend biodiesel; track the respective amounts of B100 and B99.9; track the dates and amounts when using B99.9; track the prices, purchasers, dates, and amounts for sales of B99.9; and calculate revenues and net income without BTC. If and when the BTC is retroactively reinstated, the Company must also file sufficient information with the IRS to obtain the BTC and then incorporate the BTC revenues into the appropriate periods of the publicly reported financials.

5.      During the Class Period, therefore, Renewable Energy and its executives frequently focused on those issues and assured investors that the Company was adept at those functions. Indeed, Defendants portrayed Renewable Energy as a leader in the burgeoning biodiesel industry, with adequate internal controls and processes for operations and accounting. Defendants repeatedly described to investors the scrutiny they applied to the operational and accounting effects of BTC lapses and reinstatements. Defendants also touted Renewable Energy's initiatives to increase sales of blended biodiesel—and, in turn, increase potential BTC revenue—including equipping the Company's crown jewel biodiesel production facility in Seneca, Illinois ("Seneca Plant") with a new automated 24/7 refueling station. The Seneca refueling station was another example of the Company's adeptness at navigating the dynamic biodiesel industry. Simply put, Renewable Energy was a biodiesel and BTC expert.

6.      But Defendants' representations were false. Renewable Energy did not have adequate operational and accounting controls in place, and it struggled to handle the most basic aspects of operating in the biodiesel space. Defendants' deficiencies included calculating adjusted

EBITDA (Earnings before interest, tax, depreciation, and amortization), which was the key metric the Company provided analysts and investors as the best barometer of financial health. On June 23, 2020, the Company made a partial revelation of its true incompetence, disclosing that its previously announced 2Q20 guidance of $20 million to $35 million adjusted EBITDA was erroneous because of "calculation errors," including "faulty BTC assumptions that were missed by accounting staff review." The real guidance was **a loss** of $2 million to $12 million.

7.      That revelation of flawed and extremely reckless accounting controls caused the Company's share price to fall $5.85, a 20.5% drop. As noted by one analyst, the Company "admitted that previously issued guidance contained calculation errors" and "[t]hat's not exactly what shareholders want to learn." The analyst further described the errors as "embarrassing."

8.      Despite that partial disclosure, Defendants continued misrepresenting the true state of affairs at Renewable Energy. Defendants confirmed in every single Form 10-Q and 10-K filed with the SEC during the Class Period that the Company's "disclosure controls and procedures" and its "internal control over financial reporting" were "effective." In reality, Renewable Energy lacked processes and procedures for its most basic functions. There were no processes and procedures in place:

- to ensure that the Company's plants were actually blending petroleum diesel with biodiesel in order to create B99.9;

- to track inventory correctly to have real time knowledge of the number of sold gallons of B99.9 (as opposed to B100) triggering entitlement to the BTC; or

- to confirm that the Company's BTC filings with the Internal Revenue Service ("IRS") were accurate.

9.      As a result, from January 1, 2017, the Company had improperly claimed and received from the federal government certain BTCs to which it was not entitled. Specifically, only the party that blends B100 to create B99.9 and then uses or sells that B99.9 can claim the BTCs.

Over a three-and-a-half-year period, Renewable Energy had sold what was supposed to be B99.9 to roughly two dozen customers. However, the biodiesel was actually B100. On ongoing basis from 2017 to 2020, Renewable Energy's diesel additive system at its Seneca Plant—*i.e.*, the flagship plant touted to investors—had repeatedly failed to add the 0.01% of petroleum diesel to the B100 gallons. On top of that failure, Renewable Energy had sought and received the BTCs for those B100 gallons, even though the customers (and not Renewable Energy) were the parties eligible for the BTCs. In other words, the Company had sold its customers the wrong biodiesel, appropriated the BTCs owed to those customers, and reported materially false revenue and net income figures to shareholders.

10.     Defendants concealed those facts until February 25, 2021, when they disclosed that Renewable Energy was not the "first blender" and hence not the "proper claimant for certain BTC payments on biodiesel it sold between January 1, 2017 and September 30, 2020." As a result, the Company had improperly recognized, and thus had to restate, "$38.2 million in cumulative revenue from January 2018 through September 30, 2020." Defendants admitted that, because "the aggregate BTC adjustment is material in 2019," the Company had to "restat[e] its financial statements for the years ended December 31, 2019 and 2018 and the quarters ended March 31, June 30 and September 30, 2019 and 2018."

11.     Additionally, Defendants admitted that:

- "[a] material weakness in the Company's internal control over financial reporting directly related to the restatement was found to exist as of December 31, 2020 and December 31, 2019" and

- the Company did not previously have and had only recently "established . . . additional policies and controls designed to ensure that the required blending takes place and that we properly file for the BTC."

12.     Specifically, the Company had not previously had policies and procedures to:

- "limit[] the loading to modes where the existing system is known to be functional until the system is redesigned to work in all operating modes";

- "implement a control system calculation and readout tool that enables the loading operator to validate that the proper number of petroleum diesel gallons were added to each load";

- "perform[] additional local reconciliations weekly to validate that the amount of petroleum diesel used matches the amount of petroleum diesel required to be blended"; or

- "review[] monthly inventory reconciliations prior to filing for BTC to reconfirm that the required volume of petroleum diesel has been blended."

13.     Worse yet, Defendants revealed that Renewable Energy had previously begun an investigation and communicated with the IRS over the Company's liability, leading to an agreement to "return[] the incorrectly claimed BTC credits, totaling $40.5 million" to the IRS "to correct the REG Seneca BTC claims." In other words, Defendants had known of the above issues through the span of an internal investigation and communications with the IRS, yet Defendants had concealed those facts from investors. Instead of providing investors with accurate information, Defendants had repeatedly disclosed, without any corrections or updates, that the Company's "internal controls" were "effective."

14.     Thus, Defendants' sudden, material revelations were stunning and detrimental. Renewable Energy had consistently sold itself to investors as a leader in producing and blending biodiesel and obtaining BTCs, yet it lacked policies and controls for even the most basic tasks: "to ensure that the required blending takes place and that we properly file for the BTC." Consequently, the Company's share price fell $8.17, or 9.5%, to close at $77.77 per share on February 26, 2021, on unusually heavy trading volume.

15.     Industry analysts recognized the reputational harm from a second financial reporting issue in less than a year. As analysts at Simmons Energy explained, "we expect some

[investor] frustration, as it is the second reporting 'error' in the last three quarters." Hamed Khorsand of BWS Financial, Inc. ("BWS") specifically asked Defendants Warner and Robinson, "given what happened middle of last year now, given this restatement process, what are you doing as management to keep investor confidence that these kinds of things aren't going to happen again?"

16.     Simply put, Defendants were supposed to be experts at producing and selling biofuel, navigating BTC lapses, obtaining BTCs when available, and providing accurate financial reporting that accounted for the dynamic BTC paradigm. Instead, Renewable Energy provided erroneous guidance, failed to properly mix biodiesel, made false claims to the IRS, stole its customers BTCs, and reported years of materially inaccurate financials to investors.

17.     More specifically, Defendants failed to disclose to investors that: (1) the Company did not have internal controls to ensure that its guidance model did not contain calculation errors and faulty BTC assumptions; (2) as a result, the 2Q20 guidance announced by the Company in April 2020 contained calculation errors and faulty BTC assumptions, yielding an incorrectly inflated adjusted EBITDA; (3) the Company did not have processes and procedures in place to detect failures in the diesel additive system at the Seneca Plant and/or to confirm that what it sold as B99.9 actually was B99.9; (4) there was a material weakness in the Company's internal control over financial reporting related to the purchase and use of the petroleum diesel gallons when blending with biodiesel; (5) as a result, the Company was not the proper claimant for certain BTC payments on biodiesel it sold between January 1, 2017 and September 30, 2020 and would need to refund those payments back to the IRS; (6) as a result, the Company's revenue and net income were overstated for certain periods; and (7) as a result of the foregoing, Defendants' positive

statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

18.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

19.     The claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b), § 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

20.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and § 27 of the Exchange Act, 15 U.S.C. § 78aa, because this is a civil action arising under the laws of the U.S.

21.     Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Specifically, substantial events giving rise to the claims alleged herein occurred in this District, including: (i) many of the false and misleading statements were made in or issued from this District; and (ii) many of the acts alleged herein, including the preparation and dissemination of materially false and/or misleading information, were made or issued from this District.

22.     In connection with the acts, conduct and other wrongs alleged herein, Defendants, directly and/or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the U.S. mail, interstate telephone communications and the facilities of a national securities exchange.

### III.    PARTIES

23.    Lead Plaintiff Steven Rosa purchased or acquired Renewable Energy securities at artificially inflated prices during the Class Period and suffered damages as a result of the federal securities law violations alleged herein.

24.    Defendant Renewable Energy is incorporated under the laws of Delaware with its principal executive offices located in Ames, Iowa. Renewable Energy's common stock trades on the NASDAQ exchange under the symbol "REGI."

25.    Defendant Randolph L. Howard was the Company's Chief Executive Officer ("CEO") from July 3, 2017 to January 14, 2019. Howard is also Vice Chairman of the Company's Board of Directors ("Board"), and has been a member of the Board since February 2007. During the Class Period, Defendant Howard signed and/or had ultimate authority over the Company's: (i) 2017 Annual Report exhibited to a Form 10-K filed with the SEC ("2017 10K"); (ii) first quarter 2018 Quarterly Report exhibited to a Form 10-Q filed with the SEC ("1Q18 10Q"); (iii) second quarter 2018 Quarterly Report exhibited to a Form 10-Q filed with the SEC ("2Q18 10Q"); (iv) third quarter 2018 Quarterly Report exhibited to a Form 10-Q filed with the SEC ("3Q18 10Q"); (v) 2018 Annual Report exhibited to a Form 10-K filed with the SEC ("2018 10K"); (vi) 2019 Annual Report exhibited to a Form 10-K filed with the SEC ("2019 10K"); and (vii) Restated 2018 and 2019 Annual Report exhibited to a Form 10-K/A filed with the SEC ("Amended 2018 and 2019 10Ks").

26.    Defendant Cynthia J. Warner has been the Company's CEO since January 14, 2019, and has an extensive background in oil refining operations. During the Class Period, Defendant Warner signed and/or had ultimate authority over the Company's: (i) 2018 10K; (ii) 1Q19 10Q;

(iii) 2Q19 10Q; (iv) 3Q19 10Q; (v) 2019 10K; (vi) 1Q20 10Q; (vii) 2Q20 10Q; (viii) 3Q20 10K; and (ix) Amended 2018 and 2019 10Ks.

      27.     Defendant Chad Stone was the Company's Chief Financial Officer ("CFO") from August 15, 2009 to December 3, 2020, when he was moved into a newly created role of Senior Vice President ("SVP"), Commercial Performance, overseeing the Company's planning, scheduling and optimization functions to drive commercial performance of the business. During the Class Period, Defendant Stone signed and/or had ultimate authority over the Company's: (i) 2017 10K; (ii) first quarter 2018 earnings release exhibited to a Form 8-K filed with the SEC ("1Q18 Press Release"); (iii) 1Q18 10Q; (iv) second quarter 2018 earnings release exhibited to a Form 8-K filed with the SEC ("2Q18 Press Release"); (v) 2Q18 10Q; (vi) third quarter 2018 earnings release exhibited to a Form 8-K filed with the SEC ("3Q18 Press Release"); (vii) 3Q18 10Q; (viii) fourth quarter and full year 2018 earnings release exhibited to a Form 8-K filed with the SEC ("4Q18 Press Release"); (ix) 2018 10K; (x) first quarter 2019 earnings release exhibited to a Form 8-K filed with the SEC ("1Q19 Press Release"); (xi) 1Q19 10Q; (xii) second quarter 2019 earnings release exhibited to a Form 8-K filed with the SEC ("2Q19 Press Release"); (xiii) 2Q19 10Q; (xiv) third quarter 2019 earnings release exhibited to a Form 8-K filed with the SEC ("3Q19 Press Release"); (xv) 3Q19 10Q; (xvi) fourth quarter and full year 2019 earnings release exhibited to a Form 8-K filed with the SEC ("4Q19 Press Release"); (xvii) 2019 10K; (xviii) first quarter 2020 earnings release exhibited to a Form 8-K filed with the SEC ("1Q20 Press Release"); (xix) 1Q20 10Q; (xx) second quarter 2020 earnings release exhibited to a Form 8-K filed with the SEC ("2Q20 Press Release"); (xxi) 2Q20 10Q; (xxii) third quarter 2020 earnings release exhibited to a Form 8-K filed with the SEC ("3Q20 Press Release"); and (xxiii) 3Q20 10Q.

28.     Defendant Todd Robinson has served as the Company's interim CFO since December 3, 2020, at which point he replaced Stone as CFO. Prior to that, Robinson served as the Company's treasurer. During the Class Period, Defendant Robinson signed and/or had ultimate authority over the Company's Amended 2018 and 2019 10Ks.

29.     Defendants Howard, Warner, Stone, and Robinson (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of all filings Renewable Energy made with the SEC, as well as the press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

30.     As alleged herein, Renewable Energy and the Individual Defendants acted with scienter in that they either knew or recklessly disregarded the fact that the public documents and statements issued or disseminated in the name of the Company to the investing public were materially false and misleading, and that they substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding the Company, their control over, and/or

11

receipt and/or modification of the Company's allegedly materially misleading misstatements and/or their associations with the Company, which made them privy to confidential proprietary information concerning Renewable Energy, participated in the fraudulent scheme alleged herein.

## IV.    SUBSTANTIVE ALLEGATIONS

### A. Relevant Background Concerning Renewable Energy.

31.    Founded in 1996, Renewable Energy started as West Central Cooperative ("West Central") in Ralston, Iowa.[2] The Company's history parallels that of the biodiesel industry as a whole. When Renewable Energy produced its first batch of biodiesel in 1996, the industry was in its infancy. The Company's leaders advocated for and ingrained themselves in the biodiesel industry by working with competitors for the industry's greater good.

32.    In 2006, West Central formed Renewable Energy Group, Inc. and raised $100 million. As part of a flurry of large biodiesel plant acquisitions in 2009, Renewable Energy purchased the Nova Biofuels Seneca LLC biodiesel plant in Seneca, IL which had a 60 million gallon per year capacity[3] and became the Company's REG Seneca subsidiary.[4] By 2012, Renewable Energy had reached $1 billion in annual revenue and had entered a phase of rapid expansion, selling its 1 billionth gallon of biodiesel fuel in 2014. Two years later, the Company had reached $2 billion in annual revenue, and in 2017 – just three years after selling its billionth gallon – it sold its 2 billionth gallon of biodiesel fuel. Today, Renewable Energy is the largest

---

[2] Company History, RENEWABLE ENERGY GROUP, INC. https://www.regi.com/about/company/history (last visited June 28, 2021).
[3] Ron Kotrba, *REG purchases Nova Biofuels' 60 MMgy biodiesel plant in Seneca, Ill.*, BIODIESEL MAGAZINE (Oct. 14, 2009), http://www.biodieselmagazine.com/articles/3816/reg-purchases-nova-biofuels'-60-mmgy-biodiesel-plant-in-seneca-ill./ (last visited June 28, 2021).
[4] *Renewable Energy Group Reduces Debt with Seneca Payoff*, BUSINESS WIRE VIA THE MOTLEY FOOL (Dec. 27, 2012, 2:20 PM), https://www.aol.com/2012/12/27/renewable-energy-group-reduces-debt-with-seneca-pa/ (last visited June 28, 2021).

biodiesel producer in the U.S. and contributes resources and leadership to biofuel advocacy groups globally.

33.     Currently, the Company has 12 biorefineries, including the Seneca Plant.[5] From its biorefineries or terminals, the Company sells pure B100 or blended B99.9 biodiesel as part of its REG-9000® biodiesel product line-up, which purportedly "offers more stringent standards than ASTM D6751, regardless of feedstock."[6] In other words, Renewable Energy purports to create biodiesel that exceeds the industry standard. The Company claims that "[w]ith a laboratory at each biorefinery, we make quality assurance our number one priority" and that its "[p]atent-pending feedstock purification technology guarantees quality regardless of feedstock." *Id*. The Seneca Plant is a voluntary "BQ-9000 producer and marketer," accredited by the National Biodiesel Accreditation Commission. [7]

34.     As the Company touts on its website:

> After more than 25 years as an industry leader and billions of gallons produced, **REG knows biodiesel**. ASTM International has established standards to ensure fuel quality — in biodiesel's case ASTM D6751 — but REG goes above and beyond that by participating in the BQ-9000® program as a fuel producer and marketer. **BQ-9000 combines ASTM specs with additional quality assurance steps on biodiesel production**, distribution and storage. Our fuel meets or exceeds ASTM requirements so our customers can get the most benefits possible from using biodiesel.[8]

35.     In sum, Renewable Energy purports to be a leader in the biodiesel industry, with the highest quality products and highest level of operational sophistication.

---

[5] Biorefineries, RENEWABLE ENERGY GROUP, INC., https://www.regi.com/find-fuel/production-facilities/biorefineries (last visited July 7, 2021).

[6] REG – Model 9000 – Biodiesel, ENERGY XPRT, https://www.energy-xprt.com/products/reg-model-9000-biodiesel-76203 (last visited July 7, 2021).

[7] BQ-9000 QUALITY MANAGEMENT PROGRAM, https://bq-9000.org/companies/producers.aspx (July 8, 2021).

[8] *The Highest-Quality Biodiesel Is Within Reach*, RENEWABLE ENERGY GROUP (July 6, 2021), https://www.regi.com/blogs/blog-details/resource-library/2021/07/06/the-highest-quality-biodiesel-is-within-reach (last visited July 8, 2021).

**B. The BTC Is Critical to the Biodiesel Industry and Renewable Energy.**

36.     In addition to earning revenues for selling biodiesel, Renewable Energy relies on the federal biodiesel or blender's tax credit (BTC), a $1.00 excise tax credit for each gallon of blended fuel produced. Since its implementation on January 1, 2005, the BTC has been a material source of revenue for Renewable Energy.[9] To receive the Credit, a company must physically blend pure B100 biodiesel, agri-biodiesel, or renewable diesel with petroleum diesel to produce a mixture, known as B99.9, that contains at least 0.1% diesel fuel. The company must then either sell the B99.9 to a third party or use the B99.9 in its own operations. Upon that sale or use, the company is entitled to the BTC. The incentive must first be taken as a credit against the blender's fuel tax liability and any excess may be claimed as a direct payment from the IRS.

37.     Claims for the BTC must include a copy of the certificate from a registered biodiesel producer or importer that identifies the blended fuel; specifies the fuel's biodiesel, agri-biodiesel, and/or renewable diesel content; confirms that the fuel is properly registered with the U.S. Environmental Protection Agency ("EPA"); and confirms the fuel meets the requirements of ASTM specification D6751.

38.     Because it makes the price of biodiesel competitive with the price of conventional diesel, the BTC has been crucial to the biodiesel industry's success. It has also been crucial to Renewable Energy, the largest maker of biomass-based diesel in the U.S.

39.     The BTC has not been guaranteed, however. Since implementing the BTC in 2005, Congress has allowed it to lapse multiple times. But Congress has repeatedly extended or retroactively reinstated it multiple times, including five times since 2011.

---

[9] *Biodiesel Mixture Excise Tax Credit*, U.S. DEPT. OF ENERGY, ALTERNATIVE FUELS DATA CENTER, https://afdc.energy.gov/laws/395 (last visited June 28, 2021).

40.     The status of the BTC has a material effect on Renewable Energy's performance. On February 9, 2018, for example, Congress retroactively reinstated the BTC for 2017, giving Renewable Energy a windfall of $205 million. That windfall helped turn Renewable Energy's 2017 net loss of $79.1 million into adjusted net income (excluding other losses unrelated to operations) of $206.8 million. Thus, going into the Class Period, Defendants knew or should have known that "the BTC is still what ultimately makes or breaks the [C]ompany's financial performance" because "[w]hen the BTC is in place, the business turns in healthy profits" and without the BTC, Renewable Energy "would need to grow production volumes to near impossible levels to have any shot of being profitable."[10]

### C. Defendants Knew How Important the BTC was to the Company's Financial Success and Actively Sought to Maximize BTC Revenue Throughout the Class Period.

41.     Defendants were well aware of the positive financial impact of the BTC on Renewable Energy, as well as its importance to investors. Therefore, Defendants sought to maximize the Company's BTC revenue throughout the Class Period.

42.     Renewable Energy included BTC as part of the revenue it reported. Revenue is all income generated from a company's operations and, therefore, is the top line figure of the company's income statement from which costs are subtracted to determine EBITDA and net income. EBITDA is calculated by subtracting from revenue all operating expenses except depreciation and amortization, so it shows earnings before the influence of accounting and financial deductions. Net Income, calculated by subtracting from revenue all costs and expenses,

---

[10] Maxx Chatsko, *Congress Just Handed This Company a $205 Million Windfall. Is Its Stock a Buy?*, THE MOTLEY FOOL (Apr. 16, 2018, 7:17 AM), https://www.fool.com/investing/2018/04/16/congress-just-handed-this-company-a-205-million-wi.aspx (last visited June 28, 2021).

shows the profitability of the company and, therefore, is the bottom line figure of the company's income statement.

43.     During its 4Q17 Earnings Call on March 8, 2018 – the first day of the Class Period – Defendants specifically detailed how the Company's financial statements accounted for the reinstatement of the BTC for 2017:

- Robinson: "[T]he net benefit of that [BTC] reinstatement will be reflected in our GAAP financial statements for the first quarter of 2018. Because the credit relates to our 2017 operations, our 2017 adjusted net income and adjusted EBITDA reflect the allocation of the net benefit of the reinstatement based on gallon sold in each quarter. The IRS updated it's guidance on the process for filing for the BTC refund yesterday and we have begun the process of filing for those refunds."

- Howard: "With the reinstatement last month of the BTC, we regenerated $230 million in adjusted EBITDA for 2017. This exceeds our previous best year by $80 million and is more than 50% higher than our previous high of $150 million of adjusted EBITDA."

- Stone: "Our average selling price of $3.06, decrease from the prior year. However, when you take the effect of benefit from the BTC reinstatement, our average selling price would have been $3.48 per gallon. Those combined with higher volume resulted to revenue of $2.2 billion, up 6%. Our net loss was $79.1 million or negative $2.04 per share, which again was primarily the result of BTC impact and the impairment of New Orleans. Our adjusted net income was $207 million or $5.21 per share. While the BTC was reinstated, GAAP accounting requires us to book the impact of the reinstatement in Q1 of 2018."

44.     Defendant Stone further noted that "[n]ew this year, we are reporting adjusted net income for the first time. We hope this metric provides investors with useful information to evaluate our results." He explained that:

> You can see the reconciliation of adjusted net income to GAAP net income in our earnings release, but **the most significant adjustment again relate to the retroactive BTC reinstatement**, the non-cash charges for the impairment of assets and for the convertible debt conversion liability. Our adjusted net income for the fourth quarter was $78 million or $1.97 per share. Adjusted EBITDA was $58.8 million, incorporating the reinstatement of the tax credit in the fourth quarter of 2017.

45.     Because the BTC had not been extended past 2017, Defendant Howard also assured investors that "we're working with our elected officials to see [the BTC] reinstated for a longer-term" and "believe that it could be reinstated for all of 2018 in March.... If not, we believe we will

be looking again reinstatement at year end." He further stated that "[w]ith the retroactive reinstatement of the BTC for 2018, we are forecasting $60 million to $75 million for adjusted EBITDA for the first quarter" and "expect our 2018 performance to exceed our 150 plus earnings power."

46.     Until the BTC was reinstated in December 2019, Defendants continued to reiterate their confidence in its reinstatement and to confirm their active involvement in working to ensure its reinstatement:

- 5/3/18 - Howard: "[W]e continue[] to expect [the BTC] to be reinstated near to the end of the year. **We are working** with our congressional supporters and industry allies to enact a multiyear solution for the BTC that would remove the year-to-year volatility."

- 8/6/18 - Howard: "[W]e expect the reinstatement would be taken up in the lame-duck session after midterm elections. **We're working** in close coordination with a diverse group of industry stakeholders to construct a long term solution for the BTC, to provide certainty beyond one or two years and are receiving a warm reception for members of Congress on such a solution."

- 8/6/18 – Howard: "So **we are really focused** on a BTC bio diesel excise tax credit. Relative to the term, I think we're looking at maybe even something longer than five years to get past the 2022 when the EPA takes over full review of the RFS and so at this point we are focused on something even longer than five years."

- 11/6/18 - Howard: "**We continue to expect** congressional action on the retroactive reinstatement and extension of the BTC before year-end."

- 3/5/19 - Warner: "**[W]e continue to be focused** on getting the BTC retroactively reinstated for 2018 and longer" and "remain confident that Congress will reinstate the BTC for 2018 and beyond."

- 5/2/19 - Warner: "[W]e remain confident that the incentives will be reinstated for 2018 and 2019" and "**we know from speaking to them** that we have many senators who are really just waiting for the House to float a bill, so that they can attach this to it."

- 8/6/19 - Warner: "There remains strong bipartisan support for the incentive and **we continue to be confident** that the BTC will be reinstated."

- 8/6/19 - Stone: "**[W]e're very confident** in the strong bipartisan support. It's not for a lack of support for the biodiesel industry and the need to renew the tax credit, it's more a matter of when versus if and so it's I think we've got the attention of folks when the largest producer of biomass based diesel in North America shut a plant, I think that's telling for the market participants and policymakers that something needs to change to move forward."

- 11/5/19 - Warner: "**We also continue to be encouraged by our legislators'** strong bipartisan support for BTC and their **assurances** that a retroactive reinstatement is forthcoming."

47. In addition, every quarter until the BTC was reinstated in December 2019, Defendants detailed the precise impact the expected reinstatement would have on the Company's financial statements, particularly its adjusted EBITDA:

| Earnings Announced | Results Quarter | Gallons Sold | Adjusted EBITDA *w/o BTC* | Adjusted EBITDA *with BTC* |
|---|---|---|---|---|
| 5/3/18 | 1Q18 | 135 million | $17.5 million | $60 million |
| 8/6/18 | 2Q18 | 172 million | $42.3 million | $108.5 million |
| 11/6/18 | 3Q18 | 179 million | $34.6 million | $104.6 million |
| 3/5/19 | 4Q18 | 163 million | $46 million | $103 million |
| 5/2/19 | 1Q19 | 162 million | ($27 million) | $28 million |
| 8/6/19 | 2Q19 | 197 million | ($42 million) | $39 million |
| 11/5/19 | 3Q19 | 188 million | $11 million | $88 million |
| 3/5/20 | 4Q19 | 153 million | $16 million | $65 million |

48. At the same time, Defendants regularly touted their focused efforts to increase Renewable Energy's blended fuel sales, which increased the amount of BTC for which the Company was eligible:

- 3/8/18 - Howard: "We are also focused on capturing additional margin through **blended fuel** sales by expanding our downstream distribution strategy."

- 8/6/18 - Howard: "[W]e're really focused on ramping up those [blending terminal] projects. We've added another two terminals this year after adding 10 last year. . . . I think we've added 5 fleets more on this, and when we add fleet customers, that means we're selling them a blended, **complete blended product**, so that continues to move forward."

- 11/6/18 - Howard: "We continue to grow our list of major trucking fleets and end-user customers where we supply a range of cleaner burning **blends of renewable fuel**."

- 3/5/19 - Warner: "[H]aving the terminals actually what it's doing is giving us superior access to customers we may not have had access to before. And it also enables us in many cases to provide **blends** that we couldn't have provided before, which can result in either additional sales of our products or additional sales of third-party products that we've purchased and then blend in.

  So, the terminals are actually a fantastic play because there is a multitude of benefits for it. That has been very successful for us. We continue to look at additional terminals because it gives us access to some of the more favorable markets that we're looking at. And if I just

use as an example what's happening in California, having access to those markets as well as those customers has been extremely well received especially with the Ultra Clean diesel blend, our customers are very enthused about it. And so what we're trying to do is build more terminal access, so we can actually access those customers and meet that demand in greater volume."

49.     Notably, during the first quarter 2019 earnings call on May 2, 2019 ("1Q19 Earnings Call"), Defendant Warner began touting the Company's "first-ever REG cardlock station, which is adjacent to the Seneca biorefinery" and "will be an automated, 24/7 retail fueling station" which "will offer biodiesel blends produced at our local plant." Warner then stated during the second quarter 2019 earnings call ("2Q19 Earnings Call") on August 6, 2019 that the Company had "opened the Seneca cardlock fueling station on July 17" and observed "early progress there as well as the future profit opportunity for REG in selling fueled directly to end users." Warner attended the July 17 grand opening of the fueling station at Seneca in person,[11] which obtained "the low carbon biodiesel used in the diesel blends from B11 and above" from the adjacent Seneca Plant.[12] At that time, the Seneca Plant operated with only 53 employees (*id*.), including Tim Mann, the Seneca Plant Manager.[13] Mann reported to General Manager Bruce Lutes, who in turn reported to VP of Manufacturing Brad Albin ("Albin").

50.     But during the third quarter 2019 earnings call ("3Q19 Earnings Call") on November 5, 2019, Warner confirmed that despite "[p]etroleum diesel sales, which are driven by our initiative to increase gallons blended with biodiesel, [being] up," the Company was halting its

---

[11] *Renewable Energy Group Opens First Fueling Station* (Renewable Energy Group), YOUTUBE (Aug. 19, 2019), https://www.youtube.com/watch?v=pFIc3THzWD4 (last visited July 8, 2021).

[12] *Renewable Energy Group Seneca opens their first blended biofuel station*, CONSTRUCTION BOXSCORE DATABASE, https://www.constructionboxscore.com/project-news/renewable-energy-group-seneca-opens-their-first-blended-biofuel-station.aspx (last visited July 8, 2021).

[13] Ron Kotrba, *Construction begins in Illinois on REG's 1st fueling station*, BIODIESEL MAGAZINE (Mar. 7, 2019) http://www.biodieselmagazine.com/articles/2516605/construction-begins-in-illinois-on-regundefineds-1st-fueling-station (last visited July 8, 2021).

"$30 million Seneca project" until it had "greater clarity on a combination of BTC reinstatement or a more fulsome margin recovery."

51.     When Congress finally approved a federal spending package on December 17, 2019 which included retroactively reinstating the BTC for biofuel production dating back to January 1, 2018 and extending it through the end of 2022, the price of Renewable Energy's shares rose nearly 44% in response.[14] The Company was positioned to receive a $405 million windfall for production that had already occurred and close to $1 billion for future production if volumes continued growing through the end of 2022. The reinstatement of the BTC prevented a wave of plant closures and layoffs across the biodiesel industry, but not before Renewable Energy closed "its 15-million-gal/year biodiesel plant in New Boston, Texas because of 'challenging business conditions' and continued uncertainty over an extension of the [BTC] credit."[15] Defendant Warner explained that the New Boston Plant's closure was "a result of the poor economics over the last 18 months resulting in large part from the uncertainty surrounding the biodiesel tax credit."[16]

52.     During the Company's first earnings call after the reinstatement, 4Q19 Earnings Call on March 5, 2020, Defendant Warner boasted that Renewable Energy's "blending volumes [had] expanded substantially" to "nearly 116 million blended gallons" in 2019, so "blended fuel gallons grew 29% in [the] fourth quarter and 65% for the year." Defendants continued to tout the

---

[14] Maxx Chatsko, *Here's Why Renewable Energy Group Shares Jumped as Much as 43.9% Today*, THE MOTLEY FOOL (Dec. 17, 2019, 11:18 AM), https://www.fool.com/investing/2019/12/17/heres-why-renewable-energy-group-jumped-as-much-as.aspx (last visited June 29, 2021).
[15] Michael Schneider, *The Biodiesel Tax Credit: What Does the New Extension Mean?*, OPIS (Mar. 9, 2020, 08:00 AM), http://blog.opisnet.com/biodiesel-tax-credit (last visited June 29, 2021).
[16] *Renewable Energy Group forced to close Texan biodiesel plant*, BIOFUELS INTERNATIONAL (July 24, 2019), https://biofuels-news.com/news/renewable-energy-group-forced-to-close-texan-biodiesel-plant/ (last visited July 8, 2021).

20

Company's deliberate, successful efforts to increase demand for blended biodiesel throughout the rest of the Class Period:

- 4/30/20 - Warner: "[W]e're making good progress in **increased proprietary blending**, which both captures the full dollar BTC and enhance[s] the demand for biodiesel."

- 8/4/20 - Warner: "So there's a dual element of capturing the full value across the whole value chain as well as being able to **increase the uptick of our [blended] products** more rapidly, by being able to sell direct to customers.… So we've seen **uptick with 107% increase in the blends** of biodiesel into renewable diesel."

- 11/5/20 - Stone: "[W]e brought down sales volumes of petroleum diesel quite significantly as we **shifted our blending strategy** to higher margin opportunities."

53.     In addition, throughout the Class Period, Defendants Howard, Stone, and Robinson held investor meetings with analysts outside the earnings calls in which they demonstrated detailed knowledge and active involvement in the Company's strategy, operations, and performance of the underlying business. These investor meetings with analysts corroborate Defendants Howard, Stone, and Robinson's deep knowledge of the Company's strategy, operations, and performance of the underlying business.

54.     Indeed, Roth Capital Partners raised the Company's price target following a meeting with Defendants Howard and Stone in which Roth noted it continued to like the Company because of its "strategic move into blending expands the profit potential" and served to "eliminat[e] third party blenders to capture 2/3 of the compliance incentive value."[17] Similarly, based on another meeting with Defendants Howard and Robinson, Roth stated that the use of a higher EV/EBITDA multiple was "warranted" based on "the overall stability of REG's platform," further noting that the "company's move into blending for certain markets at REG's own terminals helps capture a larger portion of compliance incentives."[18]

---

[17] Roth Capital Partners, *REGI: Mgmt Meeting Affirms Positive Outlook; Raising PT to $21* (May 17, 2018).
[18] Roth Capital Partners, *REGI: Trading Under 3x EBITDA, Incl. BTC* (June 15, 2018).

**D. Defendants Failed to Ensure that the Company's Internal Controls over Financial Reporting Were Effective.**

    *1. Renewable Energy did not have adequate processes and procedures in place to ensure that its guidance model did not contain calculation errors.*

55.    Adjusted EBITDA, which included expected BTC revenue, was a key metric Renewable Energy pointed analysts and investors to every quarter as an accurate barometer of the Company's financial health.

56.    Adjusted EBITDA computes a company's earnings to include interest expenses, taxes, and depreciation charges. "Standardizing EBITDA by removing anomalies means the resulting adjusted or normalized EBITDA is more accurately and easily comparable to the EBITDA of other companies, and to the EBITDA of a company's industry as a whole."[19]

57.    Yet Defendants failed to have internal controls in place to ensure that the Company's guidance model – which included adjusted EBITDA – did not contain calculation errors. As a publicly traded company, Renewable Energy should have had processes and procedures in place to confirm, validate and/or audit the values being input into and/or the calculations underlying the guidance model before disclosing material financial metrics in SEC filings and during earnings calls. Particularly values and calculations relating to the Company's most important financial metric, adjusted EBITDA.

58.    Investors were in the dark about the Company's deficient internal controls over financial reporting until June 23, 2020, when after markets closed, Renewable Energy disclosed that its previously announced 2Q20 adjusted EBITDA of *positive* $20 million to $35 million was actually *negative* $12 million to *negative* $2 million and admitted that one of the "factors contribut[ing] to [its] revised outlook" was that "[t]he guidance model used in connection with the

---

[19] Will Kenton, *Adjusted EBITDA Definition*, INVESTOPEDIA (updated Apr. 14, 2020), https://www.investopedia.com/terms/a/adjusted-ebitda.asp (last visited June 29, 2021).

previous estimate contained inadvertent calculation errors, which on their own would have resulted in a significant reduction in the Company's previous Adjusted EBITDA estimate."

      2. *Renewable Energy did not have adequate processes and procedures in place to ensure that biodiesel was being properly blended in order to qualify for the BTC.*

59.    Further as discussed in the 4Q20 Earnings Call, in order to realize BTC credits, Defendants were well aware that Renewable Energy had to blend its "pure B100 biodiesel … with petroleum diesel to a least a 0.1% level, creating the product known as B99.9." Yet Defendants did not ensure that the Company had processes and procedures in place to detect diesel additive system failures at its Seneca Plant which resulted in petroleum diesel being periodically not added to certain loads and/or to confirm that the fuel the Company was selling as B99.9 actually was B99.9. As Defendants confirmed during the 4Q20 Earnings Call, the Company did not have policies and procedures in place to "limit[] the loading to modes where the existing system is known to be functional until the system is redesigned to work in all operating modes" or "to validate that the proper number of petroleum diesel gallons were added to each load." If the Company had had such processes and procedures in place, the diesel additive system failures would have been detected in the same quarter that they had begun occurring.

60.    To produce a B99.9 blend, the amount of diesel being consumed over time and in the aggregate (*i.e.*, over the course of a year) would be noticeable. If someone was simply keeping track of and examining "receipts of loads of petro-diesel" being delivered to the Seneca Plant, there would have been "a stark difference" between receipts from when Renewable Energy had been correctly mixing the B99.9 blend and after the diesel additive system failures. Someone at the Seneca Plant should have noticed that the petro-diesel tank was not being consumed or refilled and/or that petro-diesel was not being reordered (because it was not being consumed). In addition,

because petro-diesel was "an input" for the production of B99.9 biodiesel, that would have been a factor in determining B99.9's cost-of-goods-sold ("COGS").

> 3. *Renewable Energy did not have adequate processes and procedures in place to ensure that its BTC claims were supported by the inventory in its plants.*

61.     Every quarter during the Class Period, Defendants touted the number of gallons of biofuel that Renewable Energy produced and sold. Defendants also used that number to calculate the BTC's impact on the Company's EBITDA. Yet Defendants did not ensure that the Company had adequate processes and procedures in place to confirm on a quarterly basis that its inventory supported its BTC claims. As Defendants confirmed during the 4Q20 Earnings Call, the Company did not have policies and procedures in place to "perform[] additional local reconciliations weekly to validate that the amount of petroleum diesel used matches the amount of petroleum diesel required to be blended" or "review[] monthly inventory reconciliations prior to filing for BTC to reconfirm that the required volume of petroleum diesel has been blended." If the Company had had such processes and procedures in place, the discrepancy in the Company's inventory, and thus the incorrect BTC filings, would have been discovered in the same quarter that the diesel additive system failures had begun occurring.

62.     Later during the 4Q20 Earnings Call, analyst Hamed Khorsand of BWS ("Analyst Khorsand") specifically asked "given what happened middle of last year now, given the restatement process, what are you doing as management to keep investor confidence that these kinds of things aren't going to happen again?"

63.     In response, Defendant Warner stated that "it's important for us to get across to everyone how seriously we take this and how strong our reactions have been, actually in both cases to follow-up on the identified issues. And it really is about putting in place stronger systems of assurance." She was forced to admit that during the Class Period, Renewable Energy did not have

processes and procedures in place to detect failures in the Seneca Plant's diesel additive system, explaining that "[t]he situation at Seneca was a one-off, it was a design issue, and it was intermittent. So putting in place, the extra assurance processes give us confidence that if there were something like that, we would become aware of it."

64.     Accounting was handled at the corporate level in Ames, Iowa through a J.D. Edwards system and rolled up to Chad Stone as the CFO. The Company's corporate accounting team, at the end of each month, reconciled the inventory levels of the plants, as well as the reported sales, to arrive at final figures representing how much fuel had been produced and sold. For their month-end reconciliations, the corporate accountants relied on supply chain data from the plants and terminals regarding inventory levels and sales. Because diesel inventories would have been affected by diesel not being used in fuel that was sold as B99.9, reconciliations by the accountants and supply chain personnel should have detected if diesel was not being consumed.

65.     The biodiesel tax credits were "a really big deal for the company" as the largest producer of biodiesel products. BTCs were important to "the entire company" because they were "a substantial amount of money," so the Company took the BTCs "seriously."

66.     The tax team, led by Jonathon Schwebach ("Schwebach"), handled the tax accounting for the BTCs. The tax team relied on the data that had been input into Renewable Energy's ERP [enterprise resource planning] and accounting systems, including gallons sold by product type, *e.g.*, B100 and B99.9. The Company also sold B98 and B95 blends, but the vast majority of what it sold was B99.9 or B100. Jane Zhou, who reported to Schwebach, was responsible for "keeping track of the numbers" related to the BTCs for the BTC tax filings each month, but additional tax personnel were required to assist with the filings whenever the BTCs were retroactively extended to a prior period.

67.    Tax personnel assisted in "organizing all the certs" related to the BTCs. In order to claim the BTC credit for the B99.9 blend, it was necessary to have "a piece of paper" setting forth how much biodiesel had been mixed with petro-diesel and in what quantities. Typically B99.9 was filled into a tank pulled by a truck, which may hold 15,000 gallons, or a rail car tank, which may hold 30,000 or more gallons. Thus, such certifications represented "huge quantities" in the volume of B99.9 they represented. It took tax personnel about a month to gather everything necessary to complete those retroactive BTC filings.

68.    The Seneca Plant was "definitely, and still is, the crown jewel" of Renewable Energy's plants as the largest and most production of all the Company's plants.

69.    Renewable Energy's former President and CEO, Daniel Oh, had characterized the Seneca Plant as a "real battleship within the business."[20] To ready it for battle, in 2013, the Company had enhanced the Seneca Plant with a barge loading facility, which Albin explained increased efficiencies because "[e]very full barge that leave Seneca equates to about 65 truckloads of biodiesel."[21]

**E.    Renewable Energy's Financial Statements Violated Relevant Accounting Policies and Principles.**

*1.    GAAP Requirements Generally*

70.    Generally Accepted Accounting Principles ("GAAP") are the principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time, against which financial presentations should be

---

[20] *REG Seneca* (Renewable Energy Group), YOUTUBE (Nov. 17, 2016) https://www.youtube.com/watch?v=mck0RhREmPk (last visited July 8, 2021).
[21] *REG opens barge berth at Seneca, Ill., biodiesel refinery*, BIODIESEL MAGAZINE (Nov. 15, 2013), http://biodieselmagazine.com/articles/9427/reg-opens-barge-berth-at-seneca-ill-biodiesel-refinery (last visited July 8, 2021).

measured. GAAP are the official accounting standards and have been codified and are primarily promulgated by the Financial Accounting Standards Board ("FASB").

71.     The SEC requires that public companies present financial statements in accordance with GAAP. SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes and other disclosures.

72.     Regulation S-X also requires that interim financial statements comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual disclosures, pursuant to 17 C.F.R. § 210.10-01(a).

### 2. Materiality

73.     As a publicly traded company, how Renewable Energy should apply materiality to its financial statements is guided by SEC Staff Accounting Bulletin: No. 99 – Materiality ("SAB 99"). Materiality is based on whether a reasonable person relying upon Renewable Energy's public statements would have been changed or influenced by the inclusion or correction of the information at issue. According to SAB 99, qualitative and quantitative factors should be considered in determining materiality.

74.     The FASB Amendments to Statements of Financial Accounting Concepts No. 9 ("Concept No. 9") issued in August 2018 clarified the concept of materiality. Concept No. 9 states that "[t]he omission or misstatement of an item in a financial report is material if, in light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item."

### 3. Accounting Standards Governing Restatements

75.     A restatement is a revision of a previously issued financial statement to correct an

error.

76.     GAAP rules governing the circumstances under which an entity should or must correct and/or amend previously issued financial statements are reflected primarily in Accounting Standards Committee ("ASC") 250, Accounting Changes and Error Corrections. An "Error in Previously Issued Financial Statements" is defined as:

> An error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or ***oversight or misuse of facts that existed at the time the financial statements were prepared.*** A change from an accounting principle that is not generally accepted to one that is generally accepted is a correction of an error.

### 4.  Relevant Internal Control Standards

77.     Management plays a critical role in the operation and growth of companies like Renewable Energy, including establishing the internal control environment within which employees function. The Committee of Sponsoring Organizations of the Treadway Commission Report ("COSO Report") defines internal control as a process that is "designed to provide reasonable assurance regarding the achievement of objectives" related to the effectiveness and efficiency of operations, the reliability of financial reporting, and compliance with applicable laws and regulations. COSO Report, Executive Summary. Renewable Energy indicated in its public Class Period filings that it and its auditor evaluated its internal controls according to the standards of the COSO Report.

78.     Generally Accepted Auditing Standards ("GAAS") outline the responsibilities of an auditor of an entity's financial statements (among other things), but also explains that management is responsible for the preparation of those financial statements. It states, in relevant part:

> The financial statements are management's responsibility. The auditor's responsibility is to express an opinion on the financial statements. ***Management is***

28

***responsible for adopting sound accounting policies and for establishing and maintaining internal control*** that will, among other things, initiate, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management. The auditor's knowledge of these matters and internal control is limited to that acquired through the audit. Thus, ***the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility***. (Auditing Standard ("AS") 1001.03.)

79.     Management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rule 13a-15(f) under the Exchange Act. The Company's internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP.

80.     The term "reliable," as used in the COSO Report, requires that financial statements prepared for external purposes be fairly presented in conformity with GAAS and regulatory requirements. The requirement of reliable financial reporting applies to published financial statements, including interim and consolidated financial statements, and selected financial data, such as earnings releases, derived from these financial statements.

81.     Internal control over financial reporting, as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act, is a process designed by, or under the supervision of, the CEO and CFO and is effected by the Board of Directors, management and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external reporting purposes in accordance with U.S. GAAP. Internal control over financial reporting includes those policies and procedures that:

- pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company;

- provide reasonable assurance that transactions are recorded as necessary to

permit preparation of financial statements in accordance with US GAAP, and that the receipts and expenditures of the Company are being made only in accordance with appropriate authorization of management and the board of directors; and

- provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

82.     A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis.

83.     The COSO Report recognizes that the chief executive officer sets the "tone at the top" that affects integrity, ethics, and other factors of a positive control environment. "In any organization, 'the buck stops' with the chief executive. He or she has ultimate ownership responsibility for the internal control system …. The influence of the CEO on an entire organization cannot be overstated." COSO Report, Chapter 8, p. 84. The chief executive fulfills this duty by providing leadership and direction to senior managers and reviewing the way they are controlling the business.

## V.     MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS AND OMISSIONS[22]

84.     The Class Period begins on March 8, 2018 when the Company announced its fourth quarter 2017 ("4Q17") financial results. During the 4Q17 Earnings Call that day, Defendant Howard stated that "*[w]ith the retroactive reinstatement of the BTC for 2018, we are forecasting $60 million to $75 million for adjusted EBITDA for the first quarter.*"

---

[22] The particular portions of the statements alleged to be false or misleading are in bold and italicized herein.

85.     The statement referenced in ¶ 84 regarding the Company's forecast was materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to Renewable Energy's business, which was known to Defendants or recklessly disregarded by them, that the Company did not have internal controls to ensure that its guidance model did not contain calculation errors and faulty BTC assumptions. Further, with regard to the Company's BTC filings with the IRS, (1) the Company did not have processes and procedures in place to detect failures in the diesel additive system at the Seneca Plant and/or to confirm that what it sold as B99.9 actually was B99.9 and (2) there was a material weakness in the Company's internal control over financial reporting related to the purchase and use of the petroleum diesel gallons when blending with biodiesel.

86.     Defendant Howard also stated during the 4Q17 Earnings Call that "*[w]e are* … *focused on capturing additional margin through blended fuel sales* by expanding our downstream distribution strategy. We highlighted terminal expansion at our Analyst Day in June and in 2017 we added 10 new terminals. We now have a network of 46 terminals."

87.     The statements referenced in ¶ 86 regarding the Company's blended fuel sales were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Renewable Energy's business, which was known to Defendants or recklessly disregarded by them, that: (1) the Company did not have processes and procedures in place to detect failures in the diesel additive system at the Seneca Plant and/or to confirm that what it sold as B99.9 actually was B99.9; and (2) there was a material weakness in the Company's internal controls over financial reporting related to the purchase and use of the petroleum diesel gallons when blending with biodiesel.

88.     On March 10, 2018, the Company filed its 2017 10K, affirming the previously reported financial results and assuring investors that its "*disclosure controls and procedures are effective as of December 31, 2017*" and that its "*internal control over financial reporting was effective as of December 31, 2017*."

89.     The statements referenced in ¶ 88 regarding the Company's controls were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Renewable Energy's business, which was known to Defendants or recklessly disregarded by them, that (1) the Company did not have internal controls to ensure that its guidance model did not contain calculation errors and faulty BTC assumptions; (2) the Company did not have processes and procedures in place to detect failures in the diesel additive system at the Seneca Plant and/or to confirm that what it sold as B99.9 actually was B99.9; (3) there was a material weakness in the Company's internal control over financial reporting related to the purchase and use of the petroleum diesel gallons when blending with biodiesel; (4) as a result, the Company was not the proper claimant for certain BTC payments on biodiesel it sold between January 1, 2017 and September 30, 2020 and would need to refund those payments back to the IRS; and (5) as a result, the Company's revenue and net income were overstated for certain periods.

90.     On May 3, 2018, Renewable Energy announced its first quarter 2018 financial results in a press release that stated, in relevant part:

- *Revenues of $689.3 million, inclusive of the BTC, up 65% y/y*
- 135 million gallons sold, up 11% y/y
- 106 million gallons produced, up 10% y/y
- *Net income of $209.2 million or $5.30 per share, inclusive of the BTC, up from net loss of $15.9 million y/y, or $(0.41) per share*
- Adjusted net income of $4.7 million or $0.12 per share, up from an Adjusted net loss of $13.6 million, excluding the BTC for 2017, y/y, or $(0.35) per share

32

- Adjusted EBITDA of $17.5 million, up from $0.6 million y/y excluding the BTC for 2017

91.     The 1Q18 Press Release further stated that "if the BTC is retroactively reinstated for 2018 on the same terms as in 2017, *REG's Adjusted net income and Adjusted EBITDA for business conducted in the quarter ended March 31, 2018 would each increase by approximately $42.5 million*."

92.     During the 1Q18 Earnings Call later that day, Defendant Howard stated that:

*GAAP net income of $209 million, or $5.30 earnings per share*, represent[s] first quarter recognition of the biodiesel excise tax credit for 2017. Our adjusted net income was $4.7 million, and our adjusted EBITDA was $17.5 million for the first quarter. *Adjusted net income and adjusted EBITDA reflect the allocation of the BTC benefit based on when the gallons were sold in 2017 and 2018, providing a better representation of the first quarter 2018 performance*.

\* \* \*

[If] "BTC is retroactively reinstated later this year, as expected, we estimate *the net BTC benefit earned this quarter would be around $42.5 million*. *Adjusted EBITDA of $60 million for the first quarter, assuming the BTC reinstatement,* continues to support, what we see as a step change in our earnings power.

93.     Defendant Stone similarly stated that:

*[T]here is approximately $42.5 million net upside to adjusted EBITDA as the BTC has reinstated for 2018 for a total of first quarter adjusted EBITDA of $60 million*. Let me try to give you a simple explanation of how we allocated the 2017 impact [of the reinstatement]. For adjusted net income and adjusted EBITDA, we allocate the benefit to the quarters when the gallons were sold. So those metrics are comparable with additional adjustments, without any additional adjustments.

94.     The statements referenced in ¶¶ 90-93 regarding the Company's financial metrics, including net income and revenue, were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Renewable Energy's business, which was known to Defendants or recklessly disregarded by them, that: (1) the Company did not have processes and procedures in place to detect failures in the diesel additive system at the Seneca Plant and/or to confirm that what it sold as B99.9 actually was B99.9; (2)

there was a material weakness in the Company's internal control over financial reporting related to the purchase and use of the petroleum diesel gallons when blending with biodiesel; (3) as a result, the Company was not the proper claimant for certain BTC payments on biodiesel it sold between January 1, 2017 and September 30, 2020 and would need to refund those payments back to the IRS; and (4) as a result, the Company's revenue and net income were overstated for certain periods.

95.     Defendant Howard further stated during the 1Q18 Earnings Call that:

> [W]e … are forecasting $30 million to $45 million for adjusted EBITDA without the 2018 BTC. ***Assuming retroactive BTC reinstatement, our adjusted EBITDA would be in the range of $80 million to $95 million***. Adjusted EBITDA for the first half, without BTC, should be in the range of $47 million to $62 million. ***And with the retroactive reinstatement of the BTC, it is approximately $150 million,*** which demonstrates our substantial earnings power. With a BTC reinstatement for 2018, we expect our 2018 performance to reinforce this step change we saw in 2017 and could ultimately exceed the record levels we achieved in 2017. ***This estimate is based on actual performance through April, existing forward contracts expected to be fulfilled in existing spot margins through the end of the quarter. Any changes of the price of diesel, RINs or LCFS [California Low Carbon Fuel Standard] credits through the end of the quarter would be expected to affect the estimated results.***

96.     The statements referenced in ¶ 95 regarding the Company's guidance were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to Renewable Energy's business, which was known to Defendants or recklessly disregarded by them, that the Company did not have internal controls to ensure that its guidance model did not contain calculation errors and faulty BTC assumptions. Further, with regard to the Company's BTC filings with the IRS, (1) the Company did not have processes and procedures in place to detect failures in the diesel additive system at the Seneca Plant and/or to confirm that what it sold as B99.9 actually was B99.9 and (2) there was a material weakness in the Company's internal controls over financial reporting related to the purchase and use of the petroleum diesel gallons when blending with biodiesel.

97.    On May 4, 2018, the Company filed its 1Q18 10-Q, affirming the previously reported financial results and assuring investors that its "*disclosure controls and procedures were effective as of March 31, 2018*" and that its "*internal control over financial reporting was effective as of March 31, 2018.*"

98.    The statements referenced in ¶ 97 regarding the Company's controls were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Renewable Energy's business, which was known to Defendants or recklessly disregarded by them, that: (1) the Company did not have internal controls to ensure that its guidance model did not contain calculation errors and faulty BTC assumptions; (2) the Company did not have processes and procedures in place to detect failures in the diesel additive system at the Seneca Plant and/or to confirm that what it sold as B99.9 actually was B99.9; (3) there was a material weakness in the Company's internal controls over financial reporting related to the purchase and use of the petroleum diesel gallons when blending with biodiesel; (4) as a result, the Company was not the proper claimant for certain BTC payments on biodiesel it sold between January 1, 2017 and September 30, 2020 and would need to refund those payments back to the IRS; and (5) as a result, the Company's revenue and net income were overstated for certain periods.

99.    On August 6, 2018, Renewable Energy announced its second quarter 2018 financial results in a press release that stated:

- ***Net income of $33.0 million or $0.78 per diluted share, up from net loss of $34.8 million, or $0.90 per diluted share y/y***
- Adjusted net income of $23.5 million or $0.56 per share, up from $4.5 million, or $0.12 per share excluding allocation of the 2017 BTC y/y
- Adjusted EBITDA of $42.3 million, up from $19.7 million y/y, excluding allocation of the 2017 BTC
- ***Revenues of $580.2 million, up 8% y/y***

100.    During the 2Q18 Earnings Call later that day, Defendant Stone further stated that:

*Including an allocation for the estimated net benefit of the BTC and assuming a retroactive reinstatement for the full year, our adjusted EBITDA would be nearly $170 million for the first half of the year* as reflected on slide 10.

101.    In addition, Defendant Howard stated during the 2Q18 Earnings Call that:

*If the BTC is reinstated retroactively as expected, we estimate adjusted EBITDA for the third would increase by approximately $60 million, bringing the total to $95 million to $110 million*. Given our first half performance, and our expectations for a strong third quarter, we are well under way to another record year.

*This estimate is based on the actual performance through the end of July, takes into account existing forward contracts expected to be fulfilled in existing spot margins to the end of the quarter. Any changes to the price of diesel, feedstocks, RIMs or LCFS credits through the end of the quarter would be expected to affect the estimated results.*

102.    The statements referenced in ¶¶ 99-101 regarding the Company's financial metrics, including net income, adjusted EBITDA, and revenue, were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Renewable Energy's business, which was known to Defendants or recklessly disregarded by them, that: (1) the Company did not have processes and procedures in place to detect failures in the diesel additive system at the Seneca Plant and/or to confirm that what it sold as B99.9 actually was B99.9; (2) there was a material weakness in the Company's internal controls over financial reporting related to the purchase and use of the petroleum diesel gallons when blending with biodiesel; (3) as a result, the Company was not the proper claimant for certain BTC payments on biodiesel it sold between January 1, 2017 and September 30, 2020 and would need to refund those payments back to the IRS; and (4) as a result, the Company's revenue and net income were overstated for certain periods.

103.    Later during the 2Q18 Earnings Call, analyst Craig Irwin of Roth Capital ("Analyst Irwin") and Defendant Howard had the following exchange:

*Irwin*: "[I]nvestors often ask about … your plan for blending more of your own product to capture greater share of RIN, greater benefit of the environmental to

compliance that biodiesel, renewable diesel brings to the market" and requested an update on "your rollout plans for the rest of the year as far as your own blending terminals, where you stand on capacity today and where you think you can go over the next couple of years?"

*Howard*: "[W]e're really focused on ramping up those [blending terminal] projects. We've added another two terminals this year after adding 10 last year. . . . I think we've added 5 fleets more on this, and when we add fleet customers, that means *we're selling them a blended, complete blended product, so that continues to move forward*."

104.    The statement referenced in ¶ 103 regarding the Company's "complete blended product" was materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Renewable Energy's business, which was known to Defendants or recklessly disregarded by them, that: (1) the Company did not have processes and procedures in place to detect failures in the diesel additive system at the Seneca Plant and/or to confirm that what it sold as B99.9 actually was B99.9; and (2) as a result, the Company was not the proper claimant for certain BTC payments on biodiesel it sold between January 1, 2017 and September 30, 2020 and would need to refund those payments back to the IRS.

105.    On August 7, 2018, the Company filed its 2Q18 10Q, affirming the previously reported financial results and assuring investors that its "*disclosure controls and procedures were effective as of June 30, 2018*" and that its "*internal control over financial reporting was effective as of June 30, 2018*."

106.    The statements referenced in ¶ 105 regarding the Company's controls were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Renewable Energy's business, which was known to Defendants or recklessly disregarded by them, that: (1) the Company did not have internal controls to ensure that its guidance model did not contain calculation errors and faulty BTC assumptions;

(2) the Company did not have processes and procedures in place to detect failures in the diesel additive system at the Seneca Plant and/or to confirm that what it sold as B99.9 actually was B99.9; (3) there was a material weakness in the Company's internal controls over financial reporting related to the purchase and use of the petroleum diesel gallons when blending with biodiesel; (4) as a result, the Company was not the proper claimant for certain BTC payments on biodiesel it sold between January 1, 2017 and September 30, 2020 and would need to refund those payments back to the IRS; and (5) as a result, the Company's revenue and net income were overstated for certain periods.

107.    On November 6, 2018, Renewable Energy announced its third quarter 2018 financial results in a press release that stated, in relevant part:

- ***Net income of $24.3 million or $0.53 per diluted share, up from net loss of $11.4 million, or $0.29 per diluted share y/y***
- Adjusted net income of $19.8 million or $0.43 per share, up from Adjusted net loss of $15.1 million, or $0.39 per diluted share excluding allocation of the federal Biodiesel Mixture Excise Tax Credit ("BTC") for 2017 y/y
- Adjusted EBITDA of $34.6 million, up from negative $1.5 million y/y, excluding allocation of the 2017 BTC
- ***Revenues of $597.8 million, down 5% y/y***

108.    During the 3Q18 Earnings Call later that day, Defendant Howard stated that "[s]hould the BTC be retroactively reinstated for the full-year and on the same terms, which we continue to expect, *we estimate that we would capture an additional $70 million for business conducted in the third quarter and $179 million for the first nine months. This would increase net income and adjusted EBITDA by equivalent amounts*."

109.    Defendant Stone further stated during the 3Q18 Earnings Call that "*[t]he operating income improvement resulted in a similar improvement in net income* as well. *Net income was a bit higher than operating income due to a small contribution from other income and expense*."

110.    The statements referenced in ¶¶ 107-109 regarding the Company's financial metrics, including net income and revenue, were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Renewable Energy's business, which was known to Defendants or recklessly disregarded by them, that: (1) the Company did not have processes and procedures in place to detect failures in the diesel additive system at the Seneca Plant and/or to confirm that what it sold as B99.9 actually was B99.9; (2) there was a material weakness in the Company's internal controls over financial reporting related to the purchase and use of the petroleum diesel gallons when blending with biodiesel; (3) as a result, the Company was not the proper claimant for certain BTC payments on biodiesel it sold between January 1, 2017 and September 30, 2020 and would need to refund those payments back to the IRS; and (4) as a result, the Company's revenue and net income were overstated for certain periods.

111.    In addition, Defendant Howard stated during the 3Q18 Earnings Call that ***"[w]e continue to grow our list of major trucking fleets and end-user customers where we supply a range of cleaner burning blends of renewable fuel***. Our downstream assets now encompass 41 terminals, serving 23 fleets and end users."

112.    Later during the 3Q18 Earnings Call, analyst Chip Moore of Canaccord Genuity asked for more information about Renewable Energy's "downstream initiatives in terms of blending, where do you stand in California, for instance?" Defendant Howard responded, in relevant part, that:

> *[B]lended fuels continue to grow year-on-year. We've seen significant increase 2018 versus 2017.* A lot of our national fleet customers are now starting to purchase that blended product in California.

113.    The statements referenced in ¶¶ 111-112 regarding the Company's "blends" or "blended fuels" were materially false and/or misleading because Defendants misrepresented

and/or failed to disclose the following adverse facts pertaining to Renewable Energy's business, which was known to Defendants or recklessly disregarded by them, that: (1) the Company did not have processes and procedures in place to detect failures in the diesel additive system at the Seneca Plant and/or to confirm that what it sold as B99.9 actually was B99.9; (2) there was a material weakness in the Company's internal controls over financial reporting related to the purchase and use of the petroleum diesel gallons when blending with biodiesel; (3) as a result, the Company was not the proper claimant for certain BTC payments on biodiesel it sold between January 1, 2017 and September 30, 2020 and would need to refund those payments back to the IRS; and (4) as a result, the Company's revenue and net income were overstated for certain periods.

114.    On November 7, 2018, the Company filed its 3Q18 10Q with the SEC, affirming the previously reported financial results and assured investors that its "*disclosure controls and procedures were effective as of September 30, 2018*" and that its "*internal control over financial reporting was effective as of September 30, 2018*."

115.    The statements referenced in ¶ 114 regarding the Company's controls were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Renewable Energy's business, which was known to Defendants or recklessly disregarded by them, that: (1) the Company did not have internal controls to ensure that its guidance model did not contain calculation errors and faulty BTC assumptions; (2) the Company did not have processes and procedures in place to detect failures in the diesel additive system at the Seneca Plant and/or to confirm that what it sold as B99.9 actually was B99.9; (3) there was a material weakness in the Company's internal control over financial reporting related to the purchase and use of the petroleum diesel gallons when blending with biodiesel; (4) as a result, the Company was not the proper claimant for certain BTC payments on biodiesel it

sold between January 1, 2017 and September 30, 2020 and would need to refund those payments

back to the IRS; and (5) as a result, the Company's revenue and net income were overstated for

certain periods.

116.    On March 5, 2019, Renewable Energy announced its fourth quarter and full year

2018 financial results in a press release that stated, in relevant part:

**Fourth Quarter 2018 Highlights:**

- ***Net income from continuing operations of $30.4 million, or $0.66 per diluted share, compared to a net loss from continuing operations of $13.9 million, or $0.36 per diluted share y/y***
- Net loss from discontinued operations of $12.2 million, or $0.33 per diluted share, compared to net loss from discontinued operations of $3.1 million, or $0.08 per diluted share y/y
- Adjusted EBITDA of $44.5 million, up from $6.5 million y/y, excluding allocation of the 2017 Biodiesel Mixture Excise Tax Credit (BTC)
- Revenues of $519.8 million
- 163.2 million gallons of fuel sold

**Full Year 2018 Highlights:**

- ***Net income from continuing operations of $295.8 million, or $6.78 per diluted share, compared to a net loss from continuing operations of $66.3 million, or $1.71 per diluted share y/y***
- Net loss from discontinued operations of $11.3 million, or $0.30 per diluted share, compared to net loss from discontinued operations of $12.8 million, or $0.33 per diluted share y/y
- Adjusted EBITDA of $138.9 million, up from $25.3 million y/y, excluding allocation of the 2017 BTC
- ***Revenues of $2.4 billion***
- 649.2 million gallons of fuel sold

117.    During the 4Q18 Earnings Call later that day, Defendant Warner stated that "we

continue to be focused on getting the BTC is retroactively reinstated for 2018 and longer.

Assuming this is achieved … we estimate ***our adjusted EBITDA for 2018 would increase by***

***approximately $237 million to almost $376 million***."

118.    In addition, Defendant Stone stated during the 4Q18 Earnings Call that "[w]e held

operating expense growth essentially in line with revenue growth which resulted in ***strong net***

*income and adjusted EBITDA*" and that "our *2018 cash flows do not yet include the estimated net benefit of approximately $237 million related to the retroactive reinstatement of the 2018 BTC*."

119.   The statements referenced in ¶¶ 116-118 regarding the Company's financial metrics, including net income, Adjusted EBITDA, and revenue, were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Renewable Energy's business, which was known to Defendants or recklessly disregarded by them, that: (1) the Company did not have processes and procedures in place to detect failures in the diesel additive system at the Seneca Plant and/or to confirm that what it sold as B99.9 actually was B99.9; (2) there was a material weakness in the Company's internal controls over financial reporting related to the purchase and use of the petroleum diesel gallons when blending with biodiesel; (3) as a result, the Company was not the proper claimant for certain BTC payments on biodiesel it sold between January 1, 2017 and September 30, 2020 and would need to refund those payments back to the IRS; and (4) as a result, the Company's revenue and net income were overstated for certain periods.

120.   Defendant Warner also stated during the 4Q18 Earnings Call that:

*[W]e're a great production Company*. Our scale has real competitive advantage. *We have built a very powerful multi-plant cross-functional system that helps us optimize … our fleet operations*.

In 2018, we produced 502 million gallons of low carbon fuel, that is an 11% increase year-over-year. *We accomplished this double-digit increase with modest capital investment in our core biorefineries. Our fleet continue to increase production from existing assets by focusing on selected debottlenecking, grade operations and continuous improvement*. Our plant set 92 weekly monthly, quarterly, and annual production records in 2018.

* * *

In summary, *we are the leading U.S. advanced biofuel refinery* featuring an outstanding team with great assets which have delivered a robust performance and *sets us up well for ongoing success*.

121.    Defendant Warner further stated during the 4Q18 Earnings Call that with regard to "predictability well things can always change based on market conditions or other factors [but] *we have a good level of confidence in our ability to estimate the controllable operating factors of gallons produced and sold*. In contrast, we have a bigger challenge when we forecast margins."

122.    Also during the 4Q18 Earnings Call, analyst Irwin and Defendant Warner had the following exchange:

> *Irwin*: "I wanted to ask about … the build out of the terminal. So you guys are obviously doing the right thing growing your distribution base where you're able to hold on to the full value of the BTC …. Can you quantify for us approximately what percentage of your gallons you do actually achieve this full monetization of the compliance value? Do you expect this to change materially with your terminal additions this year, do you care to maybe approximate where you'd like to be at the end of 2019, at the end of 2020?"

> *Warner*: "*[H]aving the terminals* actually what it's doing is giving us superior access to customers we may not have had access to before. And it also *enables us in many cases to provide blends that we couldn't have provided before, which can result in either additional sales of our products or additional sales of third-party products that we've purchased and then blend in*."

123.    The statements referenced in ¶ 120-122 regarding the Company's production, "controllable operating factors of gallons produced and sold," and blends being sold at its terminals were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Renewable Energy's business, which was known to Defendants or recklessly disregarded by them, that: (1) the Company did not have processes and procedures in place to detect failures in the diesel additive system at the Seneca Plant and/or to confirm that what it sold as B99.9 actually was B99.9; (2) there was a material weakness in the Company's internal controls over financial reporting related to the purchase and use of the petroleum diesel gallons when blending with biodiesel; and (3) as a result, the Company was not

the proper claimant for certain BTC payments on biodiesel it sold between January 1, 2017 and

September 30, 2020 and would need to refund those payments back to the IRS.

124.    On March 7, 2019, the Company filed its 2018 10K, affirming the previously

reported financial results and assuring investors that its "***disclosure controls and procedures are***

***effective as of December 31, 2018***" and that its "***internal control over financial reporting was***

***effective as of December 31, 2018***."

125.    The statements referenced in ¶ 124 regarding the Company's controls were

materially false and/or misleading because Defendants misrepresented and/or failed to disclose the

following adverse facts pertaining to Renewable Energy's business, which was known to

Defendants or recklessly disregarded by them, that (1) the Company did not have internal controls

to ensure that its guidance model did not contain calculation errors and faulty BTC assumptions;

(2) the Company did not have processes and procedures in place to detect failures in the diesel

additive system at the Seneca Plant and/or to confirm that what it sold as B99.9 actually was B99.9;

(3) there was a material weakness in the Company's internal control over financial reporting

related to the purchase and use of the petroleum diesel gallons when blending with biodiesel; (4)

as a result, the Company was not the proper claimant for certain BTC payments on biodiesel it

sold between January 1, 2017 and September 30, 2020 and would need to refund those payments

back to the IRS; and (5) as a result, the Company's revenue and net income were overstated for

certain periods.

126.    Regarding the expected impact of the BTC on Adjusted EBITDA, the 2018 10K

stated, in relevant part:

> The modification or failure to reinstate the BTC would have a material adverse
> effect on our financial results. As of December 31, 2018, we estimate that ***if the***
> ***BTC is reinstated on the same terms as in 2017, our Adjusted EBITDA for***

*business conducted in the year ended December 31, 2018 would increase by approximately $237 million*.

127.    The statements referenced in ¶ 126 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Renewable Energy's business, which was known to Defendants or recklessly disregarded by them, that (1) the Company did not have processes and procedures in place to detect failures in the diesel additive system at the Seneca Plant and/or to confirm that what it sold as B99.9 actually was B99.9; (2) there was a material weakness in the Company's internal control over financial reporting related to the purchase and use of the petroleum diesel gallons when blending with biodiesel; (3) as a result, the Company was not the proper claimant for certain BTC payments on biodiesel it sold between January 1, 2017 and September 30, 2020 and would need to refund those payments back to the IRS; and (4) as a result, the Company's revenue and net income were overstated for certain periods.

128.    On May 2, 2019, Renewable Energy announced its first quarter 2019 financial results in a press release that stated, in relevant part:

- *Revenues of $478.2 million*
- Net loss from continuing operations of $41.4 million, or $1.11 per diluted share
- Net loss from discontinued operations of $2.0 million, or $0.05 per diluted share
- Adjusted EBITDA of negative $27.4 million, excluding the potential benefit of a retroactive reinstatement of the federal Biodiesel Mixture Excise Tax Credit (BTC)

129.    During the 1Q19 Earnings Call later that day, Defendant Warner stated that "*[w]e estimate our adjusted EBITDA would increase by $55 million for business conducted in the first quarter if the incentive is reinstated* on the same terms. We continue to believe that the BTC will be reinstated in 2019."

130.    Defendant Stone further stated during the 1Q19 Earnings Call that "[o]ur adjusted EBITDA for the first quarter was negative $27 million pre-BTCs. *If the BTC is reinstated, the*

45

*adjusted EBITDA would be a positive $28 million. The net benefit of a retroactive reinstatement of the BTC would result in an increase in our adjusted EBITDA of $55 million and $43 million for the respective first quarters for 2019 and 2018*."

131.    Later during the 1Q19 Earnings Call, analyst Irwin and Defendant Stone had the following exchange about the BTC for 2018:

> *Irwin*: "Can you remind us what the cash value would be for REGI if that was reinstated tomorrow? What would you apply for from the IRS then that would show up on your balance sheet?"
>
> *Stone*: "So, **the 2018 amount of the net benefit to the BTC is $237 million** and **the net benefit for the first quarter is $55 million**. So, **in total, that's $292 million**."
>
> *Irwin*: "But the one-time cash payment from the IRS would be a $237 million cash payment for 2018. Is that correct? And then, everything this year would be additive?"
>
> *Stone*: "Yes, **that's correct. Net benefit**."

132.    The statements referenced in ¶¶ 128-131 regarding the Company's financial metrics, including revenue and adjusted EBITDA, were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Renewable Energy's business, which was known to Defendants or recklessly disregarded by them, that (1) the Company did not have processes and procedures in place to detect failures in the diesel additive system at the Seneca Plant and/or to confirm that what it sold as B99.9 actually was B99.9; (2) there was a material weakness in the Company's internal control over financial reporting related to the purchase and use of the petroleum diesel gallons when blending with biodiesel; (3) as a result, the Company was not the proper claimant for certain BTC payments on biodiesel it sold between January 1, 2017 and September 30, 2020 and would need to refund those payments back to the IRS; and (4) as a result, the Company's revenue and net income were overstated for certain periods.

133.    Defendant Warner also stated during the 1Q19 Earnings Call that:

One area of growth that *we continue to focus on* is *operational excellence and optimization*. As I noted, the 117 million gallons we produced was up 10% and is a record for first quarter, with five of our plants establishing new production records. This is an exceptional result, given that *we had to temporarily reduce production at some of our plants due to weather and poor margins*.

\* \* \*

Soon, we will open *our first-ever REG cardlock station, which is adjacent to the Seneca biorefinery*.

This will be an automated, 24/7 retail fueling station which allows any customer to obtain their fuel directly from us. Our station *will offer biodiesel blends produced at our local plant*. This location allows us to serve our customers directly and enables us to refine our approach to further expand this channel.

\* \* \*

Finally, our initiative to offer differentiated blends of renewable diesel and biodiesel products continues to gain traction…. *We sold 11 million gallons of premium blends of renewable diesel and biodiesel in the quarter*, a rapid expansion over the first quarter of 2018.

134.    In addition, Analyst Khorsand asked during the 1Q19 Earnings Call, "[c]ould you just talk about a little bit as to what you're expecting here with the increase in production that you will be starting to get some sort of positive traction on the margin side?" Defendant Warner responded:

[W]e continue to focus on underlying performance because we know the volume production is getting us a positive contribution margin in the winter months … We've been using our production capacity to build inventory and basically play an arbitrage with the lower feedstock prices that we tend to experience in the winter and the higher product margins that we get in the summer time. So, that enables us to take advantage of that increased production. And, of course, *we are developing a very substantial BTC benefit as we're doing that*.

135.    The statements referenced in ¶ 133-134 regarding the Company's "operational excellence and optimization," biodiesel blends produced at the Seneca Plant, and "volume production" were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Renewable Energy's business, which was known to Defendants or recklessly disregarded by them, that (1) the Company did not have processes and procedures in place to detect failures in the diesel additive system at the Seneca

Plant and/or to confirm that what it sold as B99.9 actually was B99.9; (2) there was a material weakness in the Company's internal control over financial reporting related to the purchase and use of the petroleum diesel gallons when blending with biodiesel; and (3) as a result, the Company was not the proper claimant for certain BTC payments on biodiesel it sold between January 1, 2017 and September 30, 2020 and would need to refund those payments back to the IRS.

136.    On May 3, 2019, Renewable Energy filed its 1Q19 10Q, affirming the previously reported financial results and assuring investors that its "***disclosure controls and procedures were effective as of March 31, 2019***" and that its "***internal control over financial reporting was effective as of March 31, 2019***."

137.    The statements referenced in ¶ 136 regarding the Company's controls were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Renewable Energy's business, which was known to Defendants or recklessly disregarded by them, that (1) the Company did not have internal controls to ensure that its guidance model did not contain calculation errors and faulty BTC assumptions; (2) the Company did not have processes and procedures in place to detect failures in the diesel additive system at the Seneca Plant and/or to confirm that what it sold as B99.9 actually was B99.9; (3) there was a material weakness in the Company's internal control over financial reporting related to the purchase and use of the petroleum diesel gallons when blending with biodiesel; (4) as a result, the Company was not the proper claimant for certain BTC payments on biodiesel it sold between January 1, 2017 and September 30, 2020 and would need to refund those payments back to the IRS; and (5) as a result, the Company's revenue and net income were overstated for certain periods.

138.    Regarding the expected impact of the BTC on Adjusted EBITDA, the 1Q19 10Q stated, in relevant part, that:

> The modification or failure to reinstate the BTC could have a material adverse effect on our financial results. As of March 31, 2019 and 2018, we estimate that *if the BTC is reinstated on the same terms as in 2017, our Adjusted EBITDA for business conducted in the periods would increase by approximately $55 million and $43 million for the quarters ending March 31, 2019 and March 31, 2018, respectively*.

139.    The statements referenced in ¶ 138 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Renewable Energy's business, which was known to Defendants or recklessly disregarded by them, that (1) the Company did not have processes and procedures in place to detect failures in the diesel additive system at the Seneca Plant and/or to confirm that what it sold as B99.9 actually was B99.9; (2) there was a material weakness in the Company's internal control over financial reporting related to the purchase and use of the petroleum diesel gallons when blending with biodiesel; (3) as a result, the Company was not the proper claimant for certain BTC payments on biodiesel it sold between January 1, 2017 and September 30, 2020 and would need to refund those payments back to the IRS; and (4) as a result, the Company's revenue and net income were overstated for certain periods.

140.    On August 6, 2019, the Company announced its second quarter 2019 financial results in a press release that stated, in relevant part:

- *Revenues of $560.6 million*
- Net loss from continuing operations of $57.6 million, or $1.52 per diluted share
- *Adjusted EBITDA of negative $42.3 million*
- *Estimated net benefit of potential reinstatement of the federal Biodiesel Mixture Excise Tax Credit (BTC) of $81.0 million for the second quarter 2019, $136.0 million for the six months ended June 30, 2019 and $373.0 million cumulatively for 2018 and the first six months of 2019*

141.    During the 2Q19 Earnings Call later that day, Defendant Warner stated that:

In keeping with the trend[] we have experienced on BTC sharing, we estimate that *third quarter adjusted EBITDA would be approximately $80 million higher if the BTC were reinstated* on term similar to past years.

*This estimate for the third quarter is based on actual performance through last week and takes into account existing forward contracts expected to be fulfilled, and existing spot margin through the end of the quarter. Any changes to the ULSD prices, margins, RINs or LCFS credit values, or a level of market volatility through the end of the quarter, could affect actual results.*

142.    Defendant Stone further stated during the 2Q19 Earnings Call that:

*Our actual [adjusted EBITDA] result was negative $42 million*. As CJ mentioned, this before BTC result is lower than expected because we took on a greater than historical portion of the expected BTC value this quarter.

*Our estimated BTC benefit was $81 million compared to our guidance estimate of $63 million*. If we add adjusted EBITDA and expected BTC benefit together in both the guidance and the result, we would have been within the lower end of our guidance range. Using the guidance midpoint, we were off by $25 million due to assumptions that did not materialize or that changed. The largest item was the field environment related to the BTC sharing resulting in a lower biodiesel average selling price in higher estimated net BTC benefit for us. The drop in biodiesel average selling price impacted our results negatively versus guidance by $19 million.

143.    Analyst Irwin followed up, and had the following exchange, with Defendant Stone during the 2Q19 Earnings Call:

*Irwin*: "[T]he changes in BTC expectations over the quarter, $63 million to $81 million, seems like there was a fairly significant change in sentiment among the buyers of your biofuel. My back of the envelope math is somewhere between 55 million and 60 million gallons was moved to where – you're the beneficiary directly of the reinstatement, and as you said, to a greater degree. … [I]s there potential for more of the product that's sold to – to move into this more favorable, longer-term BTC arrangement, but something that obviously pinches the EBITDA on the short-term?"

*Stone*: "[Y]es, **what we saw during the quarter was $18 million more of BTC upside to us than we would have expected based on our traditional relationship**. And I think it was an evolution of customer risk appetite. You think of the 20 months of – some of our customers have very large exposures to the BTC and their offers on the table may be more leaning towards us retaining the net benefit upside. … [T]he underlying theme really shows through in these numbers is that they have enough exposure in some cases and they don't want to extend that."

144.     The statements referenced in ¶ 140-143 regarding the Company's financial metrics, including revenue and Adjusted EBITDA, and the impact of the expected BTC were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Renewable Energy's business, which was known to Defendants or recklessly disregarded by them, that: (1) the Company did not have processes and procedures in place to detect failures in the diesel additive system at the Seneca Plant and/or to confirm that what the Company sold as B99.9 actually was B99.9; (2) there was a material weakness in the Company's internal controls over financial reporting related to the purchase and use of the petroleum diesel gallons when blending with biodiesel; (3) as a result, the Company was not the proper claimant for certain BTC payments on biodiesel it sold between January 1, 2017 and September 30, 2020 and would need to refund those payments back to the IRS; and (4) as a result, the Company's revenue and net income were overstated for certain periods.

145.     In addition, Defendant Warner stated during the 2Q19 Earnings Call that:

In our first quarter earnings call, I mentioned we would be opening our first REG branded cardlock station to drive higher blends of biodiesel and enhance margins. We opened the Seneca cardlock fueling station on July 17 and are pleased with the *early progress there as well as the future profit opportunity for REG in selling fueled directly to end users*.

* * *

We believe *our ability to blend biodiesel with renewable diesel is a real differentiator for REG and uniquely positions us with scale in both products*.

146.     Defendant Stone further stated during the 2Q19 Earnings Call that "*We did have substantial growth in the resale of petroleum based diesel due to more blending* as we expand our downstream distribution network."

147.     Analyst Khorsand also asked during the 2Q19 Earnings Call "[o]n the basis that BTC has not extended our renewed, what's your operational plan? I mean, obviously you can't be

51

producing business at a negative gross margin. So what are you guys operationally looking to do?"

Defendant Stone responded:

> You know, *it's the – monitoring plant by plant*. … You have, you know, positioning our balance sheet to weather this storm. We've slowed down capital expenditures too from our original operating plan and just watching margins at plants all the time. I mean, we've been through this several times before, we know the operating plan for what to do when the BTC is not in place and what we can control are those types of things and expanding our working capital line of credit, looking at what we did with debt, paying down debt, we're at our lowest debt to capital ratio of 15% in the last five years.

> And then the other *things we can control are*, things like getting downstream, moving downstream, *selling blended, the entire blend, blend fuels, the Carlock at Seneca and those types of things*. *So that's what we can do to control our destiny and we know how to operate through times when the BTC has lapsed*.

148.    The statements referenced in ¶¶ 145-147 regarding "the things [the Company] can control," including its "progress" at the Seneca Plant, "ability to blend," and growth "due to more blending" were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Renewable Energy's business, which was known to Defendants or recklessly disregarded by them, that: (1) the Company did not have processes and procedures in place to detect failures in the diesel additive system at the Seneca Plant and/or to confirm that what it sold as B99.9 actually was B99.9; (2) there was a material weakness in the Company's internal controls over financial reporting related to the purchase and use of the petroleum diesel gallons when blending with biodiesel; and (3) as a result, the Company was not the proper claimant for certain BTC payments on biodiesel it sold between January 1, 2017 and September 30, 2020 and would need to refund those payments back to the IRS.

149.    On August 7, 2019, Renewable Energy filed its 2Q19 10Q, affirming the previously reported financial results and assuring investors that its "*disclosure controls and procedures were effective as of June 30, 2019*" and its "*internal control over financial reporting was effective as of June 30, 2019*."

150.     The statements referenced in ¶ 149 regarding the Company's controls were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Renewable Energy's business, which was known to Defendants or recklessly disregarded by them, that: (1) the Company did not have internal controls to ensure that its guidance model did not contain calculation errors and faulty BTC assumptions; (2) the Company did not have processes and procedures in place to detect failures in the diesel additive system at the Seneca Plant and/or to confirm that what it sold as B99.9 actually was B99.9; (3) there was a material weakness in the Company's internal controls over financial reporting related to the purchase and use of the petroleum diesel gallons when blending with biodiesel; (4) as a result, the Company was not the proper claimant for certain BTC payments on biodiesel it sold between January 1, 2017 and September 30, 2020 and would need to refund those payments back to the IRS; and (5) as a result, the Company's revenue and net income were overstated for certain periods.

151.     Regarding the impact of the expected BTC on Adjusted EBITDA, the 2Q19 10Q stated, in relevant part:

> The failure to reinstate the BTC would have a material adverse effect on our financial results. For the three and six months ended June 30, 2019 and for the year ended December 31, 2018, we estimate that *if the BTC is reinstated on the same terms as in 2017, the effect on our Adjusted EBITDA would be as follows*:

| | Three months ended June 30, 2019 | | Six months ended June 30, 2019 | | Twelve months ended December 31, 2018 | |
|---|---|---|---|---|---|---|
| Adjusted EBITDA without BTC | $ | (42,337) | $ | (69,697) | $ | 151,981 |
| Estimated net benefit if BTC is reinstated | | 81,000 | | 136,000 | | 237,000 |
| Estimated Adjusted EBITDA if BTC is reinstated | $ | 38,663 | $ | 66,303 | $ | 388,981 |

152.     The statements referenced in ¶ 151 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Renewable Energy's business, which was known to Defendants or recklessly disregarded by them,

that: (1) the Company did not have processes and procedures in place to detect failures in the diesel additive system at the Seneca Plant and/or to confirm that what it sold as B99.9 actually was B99.9; (2) there was a material weakness in the Company's internal controls over financial reporting related to the purchase and use of the petroleum diesel gallons when blending with biodiesel; (3) as a result, the Company was not the proper claimant for certain BTC payments on biodiesel it sold between January 1, 2017 and September 30, 2020 and would need to refund those payments back to the IRS; and (4) as a result, the Company's revenue and net income were overstated for certain periods.

153.    On November 5, 2019, Renewable Energy announced its third quarter 2019 financial results in a press release that stated, in relevant part:

- ***Revenues of $584.4 million***
- Net loss from continuing operations of $13.8 million, or $0.35 per diluted share, inclusive of an $11.1 million impairment charge related to the New Boston plant closure
- ***Adjusted EBITDA of $10.6 million***
- ***Estimated net benefit of potential reinstatement of the federal Biodiesel Mixture Excise Tax Credit (BTC) of $77.0 million for the third quarter 2019, $213.0 million for the nine months ended September 30, 2019 and $450.0 million cumulatively for 2018 and the first nine months of 2019***

154.    Then, during the 3Q19 Earnings Call later that day, Defendant Warner stated that "***our adjusted EBITDA was $11 million****. **When including our estimated net benefit from a retroactive BTC reinstatement, our adjusted EBITDA would have been $88 million***."

155.    Defendant Stone further stated during the 3Q19 Earnings Call that "[i]f the BTC is reinstated on the same terms as before, ***we estimate the additional net benefit to our adjusted EBITDA would be $77 million****. **Through September of this year the 2019 estimated net benefit of a BTC reinstatement is $213 million. In the cumulative estimated total for 2018 and nine months ended 2019 is $450 million***."

156.    In addition, Defendant Stone stated during the 3Q19 Earnings Call that "we should also touch on some off balance sheet items because they're very important to understanding our current financial position. ***Our estimated BTC net benefit contingent on the credit being reinstated is now up to $450 million cumulatively***, as I mentioned before."

157.    The statements referenced in ¶¶ 153-156 regarding the Company's financial metrics, including revenues and adjusted EBITDA, were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Renewable Energy's business, which was known to Defendants or recklessly disregarded by them, that: (1) the Company did not have processes and procedures in place to detect failures in the diesel additive system at the Seneca Plant and/or to confirm that what it sold as B99.9 actually was B99.9; (2) there was a material weakness in the Company's internal controls over financial reporting related to the purchase and use of the petroleum diesel gallons when blending with biodiesel; (3) as a result, the Company was not the proper claimant for certain BTC payments on biodiesel it sold between January 1, 2017 and September 30, 2020 and would need to refund those payments back to the IRS; and (4) as a result, the Company's revenue and net income were overstated for certain periods.

158.    Defendant Warner also stated during the 3Q19 Earnings Call that:

[W]e maintained ongoing safe and efficient operations, ***delivered high quality products to our customers***, and continue to pull through improvements to underlying performance that are serving to reduce our dependence upon the BTC.

\* \* \*

***Petroleum diesel sales, which are driven by our initiative to increase gallons blended with biodiesel, were also up***.

\* \* \*

The downstream strategy is focused on three important objectives; margin expansion across the value chain, ***realization of higher biodiesel values through blends of biodiesel into petroleum diesel and renewable diesel***, and increased demand for our biodiesel, via sales of B100 to end consumers. We believe these initiatives position us to expand margin and diversified sources of profitability, to

enable us to manage through a wide variety of market conditions and increase shareholder value.

\*\*\*

Blending biodiesel with renewable diesel offers a unique substitute or complement to petroleum diesel.… ***Our biodiesel and petroleum blends are also accelerating.***

\*\*\*

For retail sales, we continue to evaluate our first automated fuel station, otherwise known as a cardlock, pilot at our Seneca plant, which we opened in July. This location was chosen due to the captive diesel truck traffic coming in and out of the plant. And of course, the convenient and cost effective proximity to the production location. ***Early indications are showing promising unit economics***.

159.     The statements referenced in ¶ 158 regarding the Company's Seneca plant and "high quality" products, including its biodiesel blends, were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Renewable Energy's business, which was known to Defendants or recklessly disregarded by them, that: (1) the Company did not have processes and procedures in place to detect failures in the diesel additive system at the Seneca Plant and/or to confirm that what it sold as B99.9 actually was B99.9; (2) there was a material weakness in the Company's internal controls over financial reporting related to the purchase and use of the petroleum diesel gallons when blending with biodiesel; and (3) as a result, the Company was not the proper claimant for certain BTC payments on biodiesel it sold between January 1, 2017 and September 30, 2020 and would need to refund those payments back to the IRS.

160.     On November 6, 2019, the Company filed its 3Q19 10Q, affirming the previously reported financial results and assuring investors that its "***disclosure controls and procedures were effective as of September 30, 2019***" and its "***internal control over financial reporting was effective as of September 30, 2019***."

161.     The statements referenced in ¶ 160 regarding the Company's controls were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the

following adverse facts pertaining to Renewable Energy's business, which was known to Defendants or recklessly disregarded by them, that: (1) the Company did not have internal controls to ensure that its guidance model did not contain calculation errors and faulty BTC assumptions; (2) the Company did not have processes and procedures in place to detect failures in the diesel additive system at the Seneca Plant and/or to confirm that what it sold as B99.9 actually was B99.9; (3) there was a material weakness in the Company's internal controls over financial reporting related to the purchase and use of the petroleum diesel gallons when blending with biodiesel; (4) as a result, the Company was not the proper claimant for certain BTC payments on biodiesel it sold between January 1, 2017 and September 30, 2020 and would need to refund those payments back to the IRS; and (5) as a result, the Company's revenue and net income were overstated for certain periods.

162.    Regarding the impact of the expected BTC on Adjusted EBITDA, the 3Q19 10Q stated:

> The failure to reinstate the BTC would have a material adverse effect on our financial results. For the three and nine months ended September 30, 2019 and for the year ended December 31, 2018, we estimate that *if the BTC is reinstated on the same terms as in 2017, the effect on our Adjusted EBITDA would be as follows*:

|  | Three months ended September 30, 2019 | Nine months ended September 30, 2019 | Twelve months ended December 31, 2018 |
|---|---|---|---|
| Adjusted EBITDA without BTC | $        10,622 | $       (59,074) | $       149,737 |
| Estimated net benefit if BTC is reinstated | 77,000 | 213,000 | 237,000 |
| Estimated Adjusted EBITDA if BTC is reinstated | $        87,622 | $       153,926 | $       386,737 |

163.    The statements referenced in ¶ 162 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Renewable Energy's business, which was known to Defendants or recklessly disregarded by them, that: (1) the Company did not have processes and procedures in place to detect failures in the diesel

additive system at the Seneca Plant and/or to confirm that what it sold as B99.9 actually was B99.9;

(2) there was a material weakness in the Company's internal controls over financial reporting

related to the purchase and use of the petroleum diesel gallons when blending with biodiesel; (3)

as a result, the Company was not the proper claimant for certain BTC payments on biodiesel it

sold between January 1, 2017 and September 30, 2020 and would need to refund those payments

back to the IRS; and (4) as a result, the Company's revenue and net income were overstated for

certain periods.

164.    On December 27, 2019, Renewable Energy filed a Form 8-K with the SEC stating,

in relevant part, that:

> On December 20, 2019, President Trump signed into law reinstatements and
> extensions of a set of tax provisions, including the retroactive reinstatement for
> 2018 and 2019 and extension for 2020 through 2022 of the federal biodiesel mixture
> excise tax credit. **With respect to the business of Renewable Energy Group, Inc.
> (the "Company") conducted in 2018 and in the first nine months of 2019, the
> amount of the retroactive credit is estimated to result in an aggregate net benefit
> to the Company in the range of $440 million to $470 million. The aggregate net
> benefit for the aforementioned period, which will be recognized in the fourth
> quarter of 2019, will increase the Company's pre-tax operating earnings by a
> similar amount.** For purposes of the Company's presentation of Adjusted
> EBITDA, the aggregate net benefit will be allocated by the Company to the
> corresponding quarterly periods in 2018 and 2019 in which the business giving rise
> to the retroactive credit was conducted.

165.    The statements referenced in ¶ 164 regarding the "net benefit to the Company" of

the retroactive BTC credit were materially false and/or misleading because Defendants

misrepresented and/or failed to disclose the following adverse facts pertaining to Renewable

Energy's business, which was known to Defendants or recklessly disregarded by them, that: (1)

the Company did not have processes and procedures in place to detect failures in the diesel additive

system at the Seneca Plant and/or to confirm that what it sold as B99.9 actually was B99.9; (2)

there was a material weakness in the Company's internal controls over financial reporting related

to the purchase and use of the petroleum diesel gallons when blending with biodiesel; (3) as a

result, the Company was not the proper claimant for certain BTC payments on biodiesel it sold

between January 1, 2017 and September 30, 2020 and would need to refund those payments back

to the IRS; and (4) as a result, the Company's revenue and net income were overstated for certain

periods.

166.    On March 5, 2020, the Company announced its fourth quarter and full year 2019

financial results in a press release that stated, in relevant part:

**Fourth Quarter 2019 Highlights:**
- ***Revenues of $1.0 billion, inclusive of the retroactive reinstatement of the Biodiesel Mixture Excise Tax Credit (BTC) for 2018 and 2019***
- ***Net income from continuing operations available to common stockholders of $492.6 million, or $11.52 per diluted share, including the BTC***
- Adjusted EBITDA of $65.0 million
- Retroactive reinstatement of the BTC for 2018 and 2019 and extension for 2020-2022
- ***Net cash benefit of $499.4 million from the BTC reinstatement for 2018 and 2019*** is expected to be received in the second quarter of 2020

**Full Year 2019 Highlights:**
- ***Revenues of $2.6 billion, including the BTC***
- ***Net income from continuing operations available to common stockholders of $381.1 million, or $9.01 per diluted share, including the BTC***
- ***Adjusted EBITDA of $217.9 million***

167.    During the 4Q19 Earnings Call later that day, Defendant Warner added that:

*[I]n the fourth quarter, we generated $572 million of revenue after adjusting for the BTC*. Adjusted EBITDA was $16 million without the BTC, a 60% increase over the third quarter, and *$65 million with the fourth quarter BTC allocation*.

For the full year, as shown on slide 6, we sold 700 million gallons of fuel and produced 495 million gallons. *After allocating the 2019 portion of the BTC, this generated $2.4 billion of revenue and $218 million of adjusted EBITDA*.

* * *

*[W]e will receive nearly $500 million net benefit from the 2018 and 2019 BTC. BTC uncertainty has now been removed and replaced with unprecedented certainty.*"

168.    Defendant Stone further stated during the 4Q19 Earnings Call that "[n]aturally, the

major impact is from the BTC. Accounts receivables reflect the gross amount of the BTC to us,

which has a partial offset in the accounts payable line for amounts we share with others. As CJ [Warner] mentioned, *the net benefit to us is almost exactly $0.5 billion, with $239 million for 2018 and $261 million for 2019. We expect to collect all of the funds during the first half of 2020.*"

169.    The statements referenced in ¶¶ 166-168 regarding the Company's financial metrics, including net income, Adjusted EBITDA, and revenue, and BTC "certainty" were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Renewable Energy's business, which was known to Defendants or recklessly disregarded by them, that: (1) the Company did not have processes and procedures in place to detect failures in the diesel additive system at the Seneca Plant and/or to confirm that what it sold as B99.9 actually was B99.9; (2) there was a material weakness in the Company's internal controls over financial reporting related to the purchase and use of the petroleum diesel gallons when blending with biodiesel; (3) as a result, the Company was not the proper claimant for certain BTC payments on biodiesel it sold between January 1, 2017 and September 30, 2020 and would need to refund those payments back to the IRS; and (4) as a result, the Company's revenue and net income were overstated for certain periods.

170.    During the 4Q19 Earnings Call later that day, Defendant Warner stated that:

Over the course of the year, *we expanded blended biodiesel volumes in line with our downstream margin capture strategy*. Recall that the downstream strategy is focused on 3 important objectives: Margin expansion across the value chain; realization of higher biodiesel values through blends of biodiesel into petroleum and renewable diesel; and increased demand for our biodiesel via sales of B100 to end consumers.

Focusing on the blending aspect of our strategy, *blended volumes expanded substantially in 2019. Our blended fuel gallons grew 29% in fourth quarter and 65% for the year. We sold nearly 116 million blended gallons for the year.* In 2019, our average blend of biodiesel into petroleum diesel was 12%.

* * *

We continue to experience through our distribution and cardlock businesses that moving right through the value chain to serve our customers directly, both increases our margin capture and enables us to expand the blending percentages of biodiesel. ***With high quality and the confidence that great customer service inspires, our customers are able to reduce their carbon footprint seamlessly.***

\* \* \*

***We are seeing a significant downstream margin capture opportunity from blending. Our customers are recognizing that high-quality biodiesel blends can provide all the function of 100% biodiesel or petroleum diesel rather, and the robust low-carbon aspects of renewable diesel***.

171.     In addition, Defendant Warner had the following exchange with analyst Irwin:

*Irwin*: "[O]n … the self-blending, blending your own biodiesel with diesel to sell to direct customers. Growth this past year to 116 million gallons, up from 70 the prior year, it's a pretty nice $45 million, $46 million increase. Can you maybe describe the number of terminals, or if this is better utilization across your terminals you're serving to get those growth gallons? And can you maybe frame out for us what you think a fair outlook for 2020 might be? How many terminals you expect to build? And is there spare capacity in your existing terminals to see growth gallons at this point?"

*Warner*: "There's a wide variety of things, our team is capable of doing, in order ***to expand that blending***. And it really is all about variety of things that happen in the downstream strategy. ***Expanding our exposure to different terminals where we can get closer to customers is definitely one of those things***. Moving further downstream to have some of these ***direct sale customers that we've described that we're expanding is another very important way***. ***The cardlock is an important way; expanding into distribution is an important way***. So, we have a very wide multipronged strategy we're able to do this. And that's why you're seeing this rapid percentage increase that you're seeing year-on-year."

172.     The statements referenced in ¶ 170-171 regarding the growth and expansion in the Company's "high quality" blends and the accompanying "margin capture" were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Renewable Energy's business, which was known to Defendants or recklessly disregarded by them, that: (1) the Company did not have processes and procedures in place to detect failures in the diesel additive system at the Seneca Plant and/or to confirm that what it sold as B99.9 actually was B99.9; (2) there was a material weakness in the Company's internal controls over financial reporting related to the purchase and use of the petroleum diesel gallons

when blending with biodiesel; and (3) as a result, the Company was not the proper claimant for certain BTC payments on biodiesel it sold between January 1, 2017 and September 30, 2020 and would need to refund those payments back to the IRS.

173.    On March 6, 2020, the Company filed its 2019 10-K, affirming the previously reported financial results and assuring investors that its "***disclosure controls and procedures are effective as of December 31, 2019***" and its "***internal control over financial reporting was effective as of December 31, 2019***."

174.    The statements referenced in ¶ 173 regarding the Company's controls were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Renewable Energy's business, which was known to Defendants or recklessly disregarded by them, that: (1) the Company did not have internal controls to ensure that its guidance model did not contain calculation errors and faulty BTC assumptions; (2) the Company did not have processes and procedures in place to detect failures in the diesel additive system at the Seneca Plant and/or to confirm that what it sold as B99.9 actually was B99.9; (3) there was a material weakness in the Company's internal controls over financial reporting related to the purchase and use of the petroleum diesel gallons when blending with biodiesel; (4) as a result, the Company was not the proper claimant for certain BTC payments on biodiesel it sold between January 1, 2017 and September 30, 2020 and would need to refund those payments back to the IRS; and (5) as a result, the Company's revenue and net income were overstated for certain periods.

175.    Regarding the impact of the reinstated BTC on the Company's net income and Adjusted EBITDA, the 2019 10K stated, in relevant part:

> ***The reinstatement of the 2018 and 2019 BTC resulted in an $499 million net benefit to our net income for the year ended December 31, 2019***. The BTC net

benefit was allocated to the corresponding quarterly Adjusted EBITDA when the business giving rise to the retroactive credit was conducted. ***For the years ended December 31, 2019 and 2018, the reinstatement of the 2018 and 2019 BTC resulted in a net benefit to our Adjusted EBITDA of $261 million and $238 million, respectively.***

176. The statements referenced in ¶ 175 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Renewable Energy's business, which was known to Defendants or recklessly disregarded by them, that: (1) the Company did not have processes and procedures in place to detect failures in the diesel additive system at the Seneca Plant and/or to confirm that what it sold as B99.9 actually was B99.9; (2) there was a material weakness in the Company's internal control over financial reporting related to the purchase and use of the petroleum diesel gallons when blending with biodiesel; (3) as a result, the Company was not the proper claimant for certain BTC payments on biodiesel it sold between January 1, 2017 and September 30, 2020 and would need to refund those payments back to the IRS; and (4) as a result, the Company's revenue and net income were overstated for certain periods.

177. On April 30, 2020, Renewable Energy announced its first quarter 2020 financial results in a press release that stated, in relevant part:

> ***Revenues for the first quarter were $475 million*** on 140 million gallons of fuel sold. ***Net income from continuing operations available to common stockholders was $75 million in the first quarter of 2020***, compared to a net loss of $41 million in the first quarter of 2019, which does not include the BTC allocation. ***Adjusted EBITDA in the first quarter was $90 million, compared to $29 million in the first quarter of 2019 including the allocation of the BTC***.

178. The statements referenced in ¶ 177 regarding the Company's financial metrics, including net income and revenue, were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Renewable Energy's business, which was known to Defendants or recklessly disregarded by them, that: (1)

the Company did not have processes and procedures in place to detect failures in the diesel additive system at the Seneca Plant and/or to confirm that what it sold as B99.9 actually was B99.9; (2) there was a material weakness in the Company's internal controls over financial reporting related to the purchase and use of the petroleum diesel gallons when blending with biodiesel; (3) as a result, the Company was not the proper claimant for certain BTC payments on biodiesel it sold between January 1, 2017 and September 30, 2020 and would need to refund those payments back to the IRS; and (4) as a result, the Company's revenue and net income were overstated for certain periods.

179.    During the 1Q20 Earnings Call later that day, Defendant Warner stated that:

*[O]ur financial position is solid with the receipt of the BTC proceeds*.

* * *

*In the second quarter, we expect* gallon sold in the range of 155 million to 175 million and *adjusted EBITDA in the range of $20 to $35 million*. Second quarter guidance includes $8 million of risk management gain recognized from the first of the month through last week.

180.    Later during the 1Q20 Earnings Call, analyst Irwin followed up on that guidance, asking "[c]an you kind of walk us through the puts and takes as we go from I guess $37 million, $38 million adjusted number down to a $20 million to $35 million number?" In response, Defendant Stone responded:

*[A]s we go to forecasting and preparing to provide guidance, we kind of know a little bit of how April started off and through basically the end of last week*, the volatile energy complex generated some additional risk management gains since the beginning of April. So *we know we're sitting on a position that we track regularly that already reflects some risk management gain and that's built into our forecasting and guidance that we provide*.

181.    Analyst Irwin further asked during the 1Q20 Earnings Call, "your adjusted EBITDA guidance range $20 million to $35 million, what would have you land at the high end of

the range versus the lower end of the range? What are the specific items we can watch for that will

cause that kind of high versus low performance?" Defendant Warner responded:

> [I]t's pretty much the factor that I outlined, particularly thinking about things like
> well the margin, of course, is one of them. And demand is going to be one, but *from
> a controllable factor standpoint, our underlying performance is a big part of it*.

182.     The statements referenced in ¶¶ 179-181 regarding the Company's financial

position, guidance, and performance was materially false and/or misleading because Defendants

misrepresented and/or failed to disclose the following adverse fact pertaining to Renewable

Energy's business, which was known to Defendants or recklessly disregarded by them, that the

Company did not have internal controls to ensure that its guidance model did not contain

calculation errors and faulty BTC assumptions.

183.     Defendant Warner also stated during the 1Q20 Earnings Call:

> Turning to other *controllable aspects of our business…. [P]roprietary
> blending which captures margins and drive volumes with also strong.* We're
> pushing hard to increase biodiesel blending into both petroleum diesel and
> renewable diesel. *Our volumes of biodiesel blended into renewable diesel
> increased to 71%*.
>
>                     * * *
>
> Downstream margin capture is our other primary strategic focus. As I
> highlighted earlier, *we're making good progress in increased proprietary
> blending, which both captures the full dollar BTC* and enhance the demand for
> biodiesel.

184.     The statements referenced in ¶ 183 regarding the Company's "controllable"

"increased proprietary blending" were materially false and/or misleading because Defendants

misrepresented and/or failed to disclose the following adverse facts pertaining to Renewable

Energy's business, which was known to Defendants or recklessly disregarded by them, that: (1)

the Company did not have processes and procedures in place to detect failures in the diesel additive

system at the Seneca Plant and/or to confirm that what it sold as B99.9 actually was B99.9; (2)

there was a material weakness in the Company's internal controls over financial reporting related

to the purchase and use of the petroleum diesel gallons when blending with biodiesel; and (3) as a result, the Company was not the proper claimant for certain BTC payments on biodiesel it sold between January 1, 2017 and September 30, 2020 and would need to refund those payments back to the IRS.

185.    On May 1, 2020, the Company filed its 1Q20 10-Q, affirming the previously reported financial results and assuring investors that its "*disclosure controls and procedures were effective as of March 31, 2020*" and its "*internal control over financial reporting was effective as of March 31, 2020*."

186.    The statements referenced in ¶ 185 regarding the Company's controls were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Renewable Energy's business, which was known to Defendants or recklessly disregarded by them, that: (1) the Company did not have internal controls to ensure that its guidance model did not contain calculation errors and faulty BTC assumptions; (2) the Company did not have processes and procedures in place to detect failures in the diesel additive system at the Seneca Plant and/or to confirm that what it sold as B99.9 actually was B99.9; (3) there was a material weakness in the Company's internal controls over financial reporting related to the purchase and use of the petroleum diesel gallons when blending with biodiesel; (4) as a result, the Company was not the proper claimant for certain BTC payments on biodiesel it sold between January 1, 2017 and September 30, 2020 and would need to refund those payments back to the IRS; and (5) as a result, the Company's revenue and net income were overstated for certain periods.

187.    Regarding the impact of the reinstated BTC on the Company's net income and Adjusted EBITDA, the 1Q20 10-Q stated, in relevant part:

***The reinstatement of the 2018 and 2019 BTC resulted in a $499 million net benefit to our net income for the year ended December 31, 2019***. The BTC net benefit was allocated to the corresponding quarterly Adjusted EBITDA when the business giving rise to the retroactive credit was conducted. ***For the three months ended March 31, 2019 and the year ended December 31, 2019, the reinstatement of the 2019 BTC resulted in a net benefit to our Adjusted EBITDA of $56 million and $261 million, respectively***.

188.    The statements referenced in ¶ 187 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Renewable Energy's business, which was known to Defendants or recklessly disregarded by them, that: (1) the Company did not have processes and procedures in place to detect failures in the diesel additive system at the Seneca Plant and/or to confirm that what it sold as B99.9 actually was B99.9; (2) there was a material weakness in the Company's internal controls over financial reporting related to the purchase and use of the petroleum diesel gallons when blending with biodiesel; (3) as a result, the Company was not the proper claimant for certain BTC payments on biodiesel it sold between January 1, 2017 and September 30, 2020 and would need to refund those payments back to the IRS; and (4) as a result, the Company's revenue and net income were overstated for certain periods.

189.    On August 4, 2020, Renewable Energy announced its second quarter 2020 ("2Q20") financial results in a press release that stated, in relevant part:

> ***Revenues for the second quarter were $546 million on 183 million gallons of fuel sold. Net income from continuing operations available to common stockholders was $1 million in the second quarter of 2020***, compared to a net loss of $58 million in the second quarter of 2019. The net loss in the second quarter of 2019 does not include the Biodiesel Mixture Excise Tax Credit ("BTC") allocation, which was retroactively reinstated in December 2019. ***Adjusted EBITDA in the second quarter was $8 million, compared to $36 million in the second quarter of 2019 including the allocation of the BTC.***

190.    During the 2Q20 Earnings Call later that day, Defendant Warner stated that "***we've sustained our profitability generating nearly $80 million of net income and close to $100 million***

*of adjusted EBITDA in the first half*" and "*we earned over $8 million of adjusted EBITDA in the second quarter*."

191.    Defendant Stone also stated during the 2Q20 Earnings Call that "*[a]t the end of the second quarter, we were in a net BTC receivable position of around $10 million*. Furthermore, we're collecting 2020 BTC amounts due as expected[.]*"

192.    The statements referenced in ¶¶ 189-191 regarding the Company's financial metrics, including revenues, net income and net BTC receivables, were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Renewable Energy's business, which was known to Defendants or recklessly disregarded by them, that: (1) the Company did not have processes and procedures in place to detect failures in the diesel additive system at the Seneca Plant and/or to confirm that what it sold as B99.9 actually was B99.9; (2) there was a material weakness in the Company's internal controls over financial reporting related to the purchase and use of the petroleum diesel gallons when blending with biodiesel; (3) as a result, the Company was not the proper claimant for certain BTC payments on biodiesel it sold between January 1, 2017 and September 30, 2020 and would need to refund those payments back to the IRS; and (4) as a result, the Company's revenue and net income were overstated for certain periods.

193.    Defendant Warner later had the following exchange with analyst Sameer Joshi of H.C. Wainwright during the 2Q20 Earnings Call:

*Joshi*: "[C]an you give us - elaborate some more on the downstream strategy and what is the progress being made on that front?

*Warner*: "The whole idea of the downstream strategy is really getting closer to the customer. *We've got some excellent experience now through distribution business that we own, that selling direct to the customer does a great job of helping now understand* the value of the lower carbon fuel as well as *the quality of it and with that confidence of blending levels that we've experienced come up rather robustly*, once we're in those

channels.… So *we've seen uptick with 107% increase in the blends of biodiesel into renewable diesel*."

194.    Defendants Warner and Stone also had the following exchange with analyst Khorsand during the 2Q20 Earnings Call:

> *Khorsand*: "[H]ow much can the industry consume of your blend and how much capacity do you have on the blend? I'm referring to you're the biodiesel and renewable blend."
>
> *Warner*: "So *it's been a very robust and steady uptick in those markets*."
>
> *Stone*: "Yes, *I happen to have been looking at those numbers over the weekend* and California is about 4-billion-gallon market. It was like 3.8 billion last year and *the recent blend data which is, includes biodiesel and renewable diesel into California has been growing almost each quarter and it's all the way up to 23% now* and to CJ's point, it can go higher particularly with renewable diesel at high concentration rates."

195.    The statements referenced in ¶¶ 193-194 regarding the "quality" of and "increase in the blends of biodiesel" by the Company were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Renewable Energy's business, which was known to Defendants or recklessly disregarded by them, that: (1) the Company did not have processes and procedures in place to detect failures in the diesel additive system at the Seneca Plant and/or to confirm that what it sold as B99.9 actually was B99.9; (2) there was a material weakness in the Company's internal controls over financial reporting related to the purchase and use of the petroleum diesel gallons when blending with biodiesel; and (3) as a result, the Company was not the proper claimant for certain BTC payments on biodiesel it sold between January 1, 2017 and September 30, 2020 and would need to refund those payments back to the IRS.

196.    On August 5, 2020, the Company filed its 2Q20 10-Q, affirming the previously reported financial results and assuring investors that its "*disclosure controls and procedures were effective as of June 30, 2020*" and its "*internal control over financial reporting was effective as of June 30, 2020*."

197.    Regarding the impact of the reinstated BTC on the Company's net income and Adjusted EBITDA, the 2Q20 10-Q stated, in relevant part:

> *The reinstatement of the 2018 and 2019 BTC resulted in a $499 million net benefit to our net income for the year ended December 31, 2019*. The BTC net benefit was allocated to the corresponding quarterly Adjusted EBITDA when the business giving rise to the retroactive credit was conducted. *For the three and six months ended June 30, 2019 and the year ended December 31, 2019, the reinstatement of the 2019 BTC resulted in a net benefit to our Adjusted EBITDA of $78 million, $135 million, and $261 million, respectively*.

198.    The statements referenced in ¶¶ 196-197 regarding the Company's controls and the financial impact of the reinstated BTC were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Renewable Energy's business, which was known to Defendants or recklessly disregarded by them, that: (1) the Company did not have processes and procedures in place to detect failures in the diesel additive system at the Seneca Plant and/or to confirm that what it sold as B99.9 actually was B99.9; (2) there was a material weakness in the Company's internal controls over financial reporting related to the purchase and use of the petroleum diesel gallons when blending with biodiesel; (3) as a result, the Company was not the proper claimant for certain BTC payments on biodiesel it sold between January 1, 2017 and September 30, 2020 and would need to refund those payments back to the IRS; and (4) as a result, the Company's revenue and net income were overstated for certain periods.

199.    On November 5, 2020, Renewable Energy announced its third quarter 2020 ("3Q20") financial results in a press release that stated, in relevant part:

> *Revenues for the third quarter were $576 million on 176 million gallons of fuel sold. Net income from continuing operations available to common stockholders was $26 million in the third quarter of 2020*, compared to a net loss of $14 million in the third quarter of 2019. The net loss in the third quarter of 2019 does not include the Biodiesel Mixture Excise Tax Credit ("BTC") allocation, which was retroactively reinstated in December 2019. *Adjusted EBITDA in the*

*third quarter was $58 million, compared to $88 million in the third quarter of 2019, including the allocation of the BTC*.

200.   The statements referenced in ¶ 199 regarding the Company's financial metrics, including revenues and net income, were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Renewable Energy's business, which was known to Defendants or recklessly disregarded by them, that: (1) the Company did not have processes and procedures in place to detect failures in the diesel additive system at the Seneca Plant and/or to confirm that what it sold as B99.9 actually was B99.9; (2) there was a material weakness in the Company's internal controls over financial reporting related to the purchase and use of the petroleum diesel gallons when blending with biodiesel; (3) as a result, the Company was not the proper claimant for certain BTC payments on biodiesel it sold between January 1, 2017 and September 30, 2020 and would need to refund those payments back to the IRS; and (4) as a result, the Company's revenue and net income were overstated for certain periods.

201.   During the 3Q20 Earnings Call later that day, Defendant Warner stated that "***sales of blends of biodiesel and renewable diesel grew 70% year-over-year***. Sales to end users are also a key element of our downstream strategy and they grew 26% in the quarter versus last year[.]"

202.   In addition, Defendant Stone stated during the 3Q20 Earnings Call that "***we brought down sales volumes of petroleum diesel quite significantly as we shifted our blending strategy to higher margin opportunities***."

203.   The statements referenced in ¶¶ 201-202 regarding the Company's growth in "sales of blends of biodiesel" and shift in "blending strategy" were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Renewable Energy's business, which was known to Defendants or recklessly disregarded by

71

them, that: (1) the Company did not have processes and procedures in place to detect failures in the diesel additive system at the Seneca Plant and/or to confirm that what it sold as B99.9 actually was B99.9; (2) there was a material weakness in the Company's internal controls over financial reporting related to the purchase and use of the petroleum diesel gallons when blending with biodiesel; and (3) as a result, the Company was not the proper claimant for certain BTC payments on biodiesel it sold between January 1, 2017 and September 30, 2020 and would need to refund those payments back to the IRS.

204.    On November 6, 2020, the Company filed its 3Q20 10-Q, affirming the previously reported financial results and assuring investors that its "***disclosure controls and procedures were effective as of September 30, 2020***" and its "***internal control over financial reporting was effective as of September 30, 2020***."

205.    Regarding the impact of the reinstated BTC on the Company's net income and Adjusted EBITDA, the 3Q20 10-Q stated, in relevant part:

> ***The reinstatement of the 2018 and 2019 BTC resulted in a $499 million net benefit to our net income for the year ended December 31, 2019***. The BTC net benefit was allocated to our corresponding quarterly adjusted earnings before interest, taxes, depreciation and amortization ("Adjusted EBITDA") when the business giving rise to the retroactive credit was conducted. ***For the three and nine months ended September 30, 2019 and the year ended December 31, 2019, the reinstatement of the 2019 BTC resulted in a net benefit to our Adjusted EBITDA of $77 million, $212 million, and $261 million, respectively***.

206.    The statements referenced in ¶¶ 204-205 regarding the Company's controls and the financial impact of the reinstated BTC were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Renewable Energy's business, which was known to Defendants or recklessly disregarded by them, that: (1) the Company did not have processes and procedures in place to detect failures in the diesel additive system at the Seneca Plant and/or to confirm that what it sold as B99.9 actually was B99.9; (2)

there was a material weakness in the Company's internal controls over financial reporting related to the purchase and use of the petroleum diesel gallons when blending with biodiesel; (3) as a result, the Company was not the proper claimant for certain BTC payments on biodiesel it sold between January 1, 2017 and September 30, 2020 and would need to refund those payments back to the IRS; and (4) as a result, the Company's revenue and net income were overstated for certain periods.

207.    On December 3, 2020, Renewable Energy announced that Chad Stone had "ceased to serve as the Company's principal financial officer" and was instead the "Senior Vice President, Commercial Performance of the Company."

208.    The statements referenced in ¶ 207 regarding the demotion of Defendant Stone were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Renewable Energy's business, which was known to Defendants or recklessly disregarded by them, that: (1) the Company did not have processes and procedures in place to detect failures in the diesel additive system at the Seneca Plant and/or to confirm that what it sold as B99.9 actually was B99.9; (2) there was a material weakness in the Company's internal controls over financial reporting related to the purchase and use of the petroleum diesel gallons when blending with biodiesel; (3) as a result, the Company was not the proper claimant for certain BTC payments on biodiesel it sold between January 1, 2017 and September 30, 2020 and would need to refund those payments back to the IRS; and (4) as a result, the Company's revenue and net income were overstated for certain periods.

## VI.    THE TRUTH EMERGES

209.    After the markets closed on June 23, 2020, Renewable Energy disclosed that the 2Q20 adjusted EBITDA it had announced on April 30, 2020 – *positive* $20 million to $35 million

– was wrong.[23] It was actually *negative* $12 million to *negative* $2 million. The Company further admitted that one of the "factors contribut[ing] to [its] revised outlook" was that "[t]he guidance model used in connection with the previous estimate contained inadvertent calculation errors, which on their own would have resulted in a significant reduction in the Company's previous Adjusted EBITDA estimate." *Id.*

210.     The next day, an analyst with Roth Capital noted that "[management] explained the guid[anc]e given in April [2020] included faulty BTC assumptions that were missed by accounting staff review."[24] The analyst believed that "the forecast error was traced back to COVID-19 work from home issues, where MS exchange sheets weren't correctly reconciled." *Id.*

211.     On these revelations, the Company's share price fell $5.85, or 20.5% to close at $22.73 per share on June 24, 2020, on unusually heavy trading volume.

212.     After the markets closed that day, an analyst for the Motley Fool commented that Renewable Energy's shares "fell as much as 21.1% today after the company reduced second-quarter 2020 guidance" and while "poor market conditions contributed to the revision," the Company "admitted that previously issued guidance contained calculation errors. That's not exactly what shareholders want to learn."[25] The analyst further described such errors as "embarrassing."

---

[23] *Renewable Energy Group Revises Outlook for Second Quarter 2020*, RENEWABLE ENERGY GROUP, INC. (June 23, 2020, 04:30 PM), https://investor.regi.com/news-events/press-releases/detail/239/renewable-energy-group-revises-outlook-for-second-quarter (last visited June 29, 2021).

[24] Craig Irwin, *REGI: Adjusting Estimates for Lowered 2Q20 Guide; Maintain $33 Price Target*, ROTH CAPITAL PARTNERS (June 24, 2020).

[25] Maxx Chatsko, *Shares of Renewable Energy Group Slide After Revising Q2 Outlook Lower*, THE MOTLEY FOOL (June 24, 2020, 04:08 PM), https://www.fool.com/investing/2020/06/24/shares-of-renewable-energy-group-slide-after-revis.aspx (last visited June 29, 2021).

213.    Then, after the markets closed on August 4, 2020, Renewable Energy surprised investors by beating that reduced 2Q20 guidance, "manag[ing] to deliver $8 million in adjusted EBITDA." This was welcome news after the Company had just "approached investors [in late June], hat in hand, to walk back previously announced guidance" for 2Q20 by $34.5 million at the midpoints as a result of market conditions deteriorating and, "embarrassingly, the company [had] discovered errors in its financial calculations."[26] The Company had signaled to investors that it was operating correctly and accurately, including with internal controls, after the embarrassing errors in June. Thus, on this news, the Company's share price increased 13.2% to close at $32.48 per share on August 6, 2020.

214.    But after the markets closed on February 25, 2021, the Company issued a press release announcing its fourth quarter and full year 2020 financial results ("2/25/21 Press Release") and revealing, *inter alia*, that Renewable Energy had improperly recognized, and had to restate, "$38.2 million in cumulative revenue from January 2018 through September 30, 2020" as a result of the Company not being the "proper claimant for certain BTC payments on biodiesel it sold between January 1, 2017 and September 30, 2020."[27] Defendants admitted that because "the aggregate BTC adjustment is material in 2019," the Company had to "restat[e] its financial statements for the years ended December 31, 2019 and 2018 and the quarters ended March 31, June 30 and September 30, 2019 and 2018." Defendants further admitted that a "[a] material

---

[26] Maxx Chatsko, *Renewable Energy Group Posts Surprise Q2 Profit*, THE MOTLEY FOOL (Aug. 5, 2020, 03:34 PM) https://www.fool.com/investing/2020/08/05/renewable-energy-group-posts-surprise-q2-profit.aspx (last visited June 29, 2021).

[27] *Renewable Energy Group Reports Fourth Quarter and Full Year 2020 Financial Results; Restates Financial Results for 2018, 2019 and First Three Quarters of 2020*, RENEWABLE ENERGY GROUP, INC. (Feb. 25, 2021, 04:05 PM EST), https://investor.regi.com/news-events/press-releases/detail/259/renewable-energy-group-reports-fourth-quarter-and-full-year (last visited June 29, 2021).

weakness in the Company's internal control over financial reporting directly related to the restatement was found to exist as of December 31, 2020 and December 31, 2019." The Company also revealed that it had reached an agreement with the IRS to "return[] the incorrectly claimed BTC credits, totaling $40.5 million" ($14.8, $9.9, $7.6 and $8.2 million for 2017, 2018, 2019, and the first three quarters of 2020, respectively) to the IRS "to correct the REG Seneca BTC claims."

215.    In the 2/25/21 Press Release, Defendants explained that "[d]ue to failures in the diesel additive system at the Company's facility in Seneca, Illinois, petroleum diesel was periodically not added to certain loads" so "the Company's customers who received these loads and subsequently added petroleum diesel are the proper claimants" for the associated BTC payments. Defendants noted that "[t]he Company discovered the blending discrepancy in connection with its preparation for a standard IRS audit of its BTC filings."

216.    The same day, Renewable Energy filed its Amended 2019 10-K restating its revenues and net income as follows:

> The impact on the Company's financial statements for the years ended December 31, 2019 and 2018 is to decrease Biomass-based diesel government incentives revenue and increase interest expense (thereby increasing accounts payable and accrued expenses and other liabilities as shown on the balance sheet), as follows:

| | Years Ended | |
| | December 31, 2019 | December 31, 2018 |
| (in thousands) | | |
| Reduction in revenues | $ 16,177 | $ 14,509 |
| Increase in interest expense | 1,059 | 649 |
| Reduction in net income | $ 17,236 | $ 15,158 |

217.    The Amended 2019 10-K also identified the following "***Material Weakness in Internal Control Over Financial Reporting***:"

The Company's BTC filings are subject to standard audits by the Internal Revenue Service ("IRS"). In connection with the Company's preparation for audits of its 2018 and 2019 BTC filings, the Company discovered that fewer gallons of petroleum diesel had been blended at the Company's biorefinery in Seneca, Illinois, than would be required for the volume of B99.9 reported as being sold during each those two years. Following the identification of this shortage, the Company initiated an investigation, which found that the petroleum diesel additive system at the Company's Seneca biorefinery was periodically not adding petroleum diesel to certain loads.

As a result, the Company identified certain errors in its previously reported financial statements for the years ended December 31, 2019 and 2018. The Company's preventive and review controls failed to detect the errors related to the purchase and use of the petroleum diesel gallons when blending with biodiesel. The material weakness resulted in an overstatement of biomass-based diesel government incentive revenue and an understatement of interest expense for the years ended December 31, 2019 and 2018 and a corresponding understatement of accounts payable and accrued expenses and other liabilities as of December 31, 2019 and 2018. This material weakness has not been remediated as of December 31, 2019, and due to this, the Company concluded that its internal control over financial reporting was not effective as of December 31, 2019.

218.    On the same day, during Renewable Energy's 4Q20 Earnings Call, Defendant Warner confirmed that the Company had finally "established . . . additional policies and controls designed to ensure that the required blending takes place and that we properly file for the BTC." Those new policies and controls included:

- "limiting the loading to modes where the existing system is known to be functional until the system is redesigned to work in all operating modes;"

- "implement[ing] a control system calculation and readout tool that enables the loading operator to validate that the proper number of petroleum diesel gallons were added to each load;"

- "performing additional local reconciliations weekly to validate that the amount of petroleum diesel used matches the amount of petroleum diesel required to be blended;" and

- "reviewing monthly inventory reconciliations prior to filing for BTC to reconfirm that the required volume of petroleum diesel has been blended."

219.    Later during the 4Q20 Earnings Call, analyst Khorsand specifically asked "given what happened middle of last year now given the restatement process, what is -- what are you

doing as management to keep investor confidence that these kinds of things aren't going to happen again?"

220.    In response, Defendant Warner stated that "it's important for us to get across to everyone how seriously we take this and how strong our reactions have been, actually in both cases to follow-up on the identified issues. And it really is about putting in place stronger systems of assurance." She was forced to admit that during the Class Period, Renewable Energy did not have processes and procedures in place to detect failures in the Seneca Plant's diesel additive system, explaining that "[t]he situation at Seneca was a one-off, it was a design issue, and it was intermittent. So putting in place, the extra assurance processes give us confidence that if there were something like that, we would become aware of it."

221.    In response to the Company's disclosures, multiple analysts pointed out that investors would react negatively to the restatement. On February 26, 2021, analysts at Wolfe Research noted that "[t]he sticker shock of the restatement … could pressure the stock near term." On the same day, analysts at Simmons Energy ["Simmons Analyst Report"] explained that:

> REG announced the restatement of $38.2 million in cumulative revenue from Jan. 2018 through Sept 30, 2020, due to diesel additive system failures at the Seneca facility that caused REG to not be the first blender (ie. qualify for BTC). … [W]e expect some frustration, as it is the **second reporting "error" in the last three quarters**.

222.    Unsurprisingly then, the Company's share price fell $8.17, or 9.5%, to close at $77.77 per share on February 26, 2021, on unusually heavy trading volume, in response to its February 25, 2021 disclosures.

223.    Analysts recognized that Renewable Energy's share price likely would have fallen further if its 4Q20 results had not at least beaten expectations. First, the Simmons Analyst Report stated that "[d]espite a relatively encouraging 4Q result, we expect weakness in REGI shares, driven by 1) the **second reporting error in the last 12 months**." Then, on March 1, 2021, analysts

at BWS issued a report noting that the Company "reported better than expected fourth quarter results that were overshadowed by a **failure to oversee a production issue that resulted in a restatement**" and that the Company "not having the appropriate measures in place to catch this mixing issues creates control questions." Since "[t]he restatement is likely to create some investor uneasiness related to controls," it "could remain an overhang in the short-term."

224.    On March 1, 2021, the Company filed its annual report on Form 10-K for the period ended December 31, 2020 (the "2020 10-K"), which included a report from its auditor, Deloitte & Touch LLP ("Deloitte Report"), opining that "because of the effect of the material weakness identified below on the achievement of the objectives of the control criteria, the Company has not maintained effective internal control over financial reporting as of December 31, 2020,based on criteria established in Internal Control — Integrated Framework (2013) issued by COSO."  The identified material weakness was that:

> The Company's controls failed to detect an error in the recognition of revenue from biomass-based diesel government incentives. The error resulted from the failure to blend petroleum diesel with biodiesel, a necessary step for the Company to comply with the requirements of the federal biodiesel mixture excise tax credit (the "BTC"), and to identify the failure prior to recognizing BTC revenue. This material weakness has not been remediated as of December 31, 2020, and due to this, the Company concluded that its internal control over financial reporting was not effective as of December 31, 2020.

225.    On May 18, 2021, the Company terminated Albin, effective June 1, 2021.[28] The Company had just promoted him to its SVP, Manufacturing & Engineering, on December 3, 2020, noting that he had "led the substantial development and growth of the company's production fleet and engineering function" since joining the Company in 2006.[29]

---

[28] Renewable Energy Group, Inc., Current Report (Form 8-K) (May 19, 2021).

[29] *Renewable Energy Group Announces Changes to Organization*, BUSINESS WIRE (Dec. 3, 2020, 09:31 AM ET), https://www.businesswire.com/news/home/20201203005632/en/ (last visited July 8, 2021).

## VII.  LOSS CAUSATION

226.    The two declines in Renewable Energy's share price during the Class Period as alleged herein are actionable. The timing and magnitude of the Company's share price declines on each of those days negates any inference that the losses suffered by Plaintiff and the Class was caused by changed market conditions, macroeconomic or industry factors or Renewable Energy-specific facts unrelated to Renewable Energy and the Individual Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiff and other Class members was a direct result of Renewable Energy and the Individual Defendants' fraudulent statements and the corresponding artificial inflation in Renewable Energy's securities prices and the subsequent significant decline in the value of the securities when Renewable Energy and the Individual Defendants' prior acts of misconduct were revealed.

227.    At all relevant times, Renewable Energy and the Individual Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Plaintiff and the putative Class. Those statements were materially false and misleading by their failure to disclose a true and accurate picture of Renewable Energy's ability to produce and sell biofuel profitably. Throughout the Class Period, Defendants publicly issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing Renewable Energy securities to be artificially inflated. Plaintiff and other Class members purchased and/or acquired Renewable Energy securities at those artificially inflated prices, causing them to suffer the damages complained of herein.

228.    Renewable Energy and the Individual Defendants were deliberately reckless in not knowing or turning a blind eye to the fact that the Company's internal controls were deficient.

Nonetheless, Renewable Energy and the Individual Defendants made materially false and misleading public statements that provided false information to investors about the Company's internal controls and financial health. Thus, shares of the Company's stock continued to trade at levels artificially inflated by Renewable Energy and the Individual Defendants' misleading justifications for the negative information revealed on June 23, 2020, which maintained the artificial inflation in the Company's share price until it was finally fully removed on February 25, 2021.

## VIII.   PRESUMPTION OF RELIANCE – FRAUD ON THE MARKET

229.   Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things: (a) Defendants made public misrepresentations or failed to disclose material facts; (b) the omissions and misrepresentations were material; (c) the Company's stock traded in an efficient market; (d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and (e) Plaintiff and the other members of the Class purchased Renewable Energy securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

230.   At all relevant times, the market for Renewable Energy securities was efficient for the following reasons, among others: (a) Renewable Energy's securities met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient market; (b) during the Class Period, shares of Renewable Energy's common stock were actively traded, demonstrating a strong presumption of efficiency; (c) as an SEC regulated issuer, Renewable Energy filed with the SEC periodic public reports; (d) Renewable Energy regularly communicated with public investors, including through regular disseminations of press releases on the major

newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and (e) unexpected material news about Renewable Energy was rapidly reflected in and incorporated into its stock price during the Class Period.

231.     As a result, the market for Renewable Energy securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of Renewable Energy's stock. Under these circumstances, all purchasers or acquirers of Renewable Energy securities during the Class Period suffered similar injury through their purchase or acquisition of Renewable Energy securities at artificially inflated prices, including at a Class Period high of $113.68 per share on February 10, 2021, and a presumption of reliance applies.

232.     In addition, Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the claims asserted herein are predicated in part upon material omissions of fact that Defendants had a duty to disclose.

## IX.    INAPPLICABILITY OF SAFE HARBOR

233.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. All of the specific statements pleaded herein were not identified as, and/or were not "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, the Company and the Individual Defendants are liable for those false forward-looking

statements because at the time each of those forward-looking statements was made, the particular

speaker knew that the particular forward-looking statement was false, and/or the forward-looking

statement was authorized and/or approved by an executive officer of Renewable Energy named

under the Exchange Act who knew that those statements were materially false and misleading

when made.

## X.   CLASS ALLEGATIONS

234.   Plaintiff brings this action as a class action, pursuant to Fed. R. Civ. P. 23(a) and

23(b)(3), on behalf of a class consisting of all person and entities that purchased, or otherwise

acquired, Renewable Energy during the Class Period, and were damaged by the conduct asserted

herein. Defendants and their immediate families and legal representatives, heirs, successors or

assigns and any entity in which the Defendants named herein have, or had, a controlling interest,

are excluded from the Class.

235.   The members of the Class are so numerous that joinder of all members is

impracticable. The disposition of their claims in a class action will provide substantial benefits to

the parties and the Court. While the exact number of Class members is unknown to Plaintiff at this

time, and can only be ascertained through appropriate discovery, Plaintiff believes that there are

hundreds, if not thousands, of members of the proposed Class. Throughout the Class Period,

between approximately 37 and 40 million shares of Renewable Energy securities were outstanding,

owned and/or publicly traded on the NASDAQ by hundreds, if not thousands, of persons.

236.   There is a well-defined community of interest in the questions of law and fact

involved in this case. Questions of law and fact common to the members of the Class that

predominate over questions that may affect individual class members include whether:

(a)   Defendants violated the federal securities laws;

(b)   Defendants omitted and/or misrepresented material facts;

(c)     Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     With respect to Plaintiff's Exchange Act claims, the Company and the Independent Defendants, with deliberate recklessness, disregarded or turned a blind eye toward the fact that their Class Period statements were false and misleading;

(e)     The price of Renewable Energy securities was artificially inflated; and

(f)     The extent of damage sustained by Class members and the appropriate measure of damages.

237.    Plaintiff's claims are typical of those of the Class members because they each were similarly damaged by Defendants' wrongful conduct in violation of the federal securities laws.

238.    Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel who are experienced in securities class action litigation. Plaintiff has no interests that conflict with those of the Class.

239.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulties in the management of this action that would preclude its maintenance as a class action.

**XI.    CLAIMS FOR RELIEF**

<u>**COUNT I**</u>
**Violations of § 10(b) of the Exchange Act and**
**Rule 10b-5 Promulgated Thereunder**
**(Against Renewable Energy and the Individual Defendants)**

240.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. This claim is brought pursuant to § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10(b)-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, against Renewable Energy and the Individual Defendants.

241.    The Defendants in this Count, carried out a plan, scheme, and course of conduct which was intended to, and did: (a) deceive the investing public, including Plaintiff and the other

Class members, as alleged herein; and (b) cause Plaintiff and the other members of the Class to purchase Renewable Energy securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Renewable Energy and the Individual Defendants took the actions set forth herein.

242.    During the Class Period, Renewable Energy and the Individual Defendants participated in the preparation of and/or disseminated or approved the false statements specified above, which they knew, or deliberately disregarded as or turned a blind eye to being misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

243.    The Defendants in this Count: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers or acquirers of Renewable Energy securities in an effort to maintain artificially high market prices for Renewable Energy securities in violation of § 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

244.    Renewable Energy and the Individual Defendants, individually and together, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about the business, operation, and future prospects of Renewable Energy as specified herein.

245.   Renewable Energy and the Individual Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Renewable Energy's value and performance and continued substantial growth, which included the preparation of and/or dissemination or approval of untrue statements of material facts and/or omitting to state material facts necessary in order to make statements made about Renewable Energy and its business operations and further prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and course of business which operated as a fraud and deceit upon the purchasers and acquirers of Renewable Energy securities during the Class Period.

246.   Renewable Energy and the Individual Defendants had motive and opportunity to perpetrate the fraudulent scheme and course of conduct described herein. Renewable Energy and the Individual Defendants prepared and disseminated the fraudulent SEC filings to investors.

247.   The Individual Defendants were the most high-level executives and/or directors at Renewable Energy and members of the Company's management team or had control thereof. By virtue of their responsibilities and activities as a senior officer, the Individual Defendants were: (i) privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections, and/or reports; (ii) engaged in significant personal conduct and familiarity with the other defendants and were advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iii) aware of and/or participated in the issuing of statements and press releases on behalf of the Company, and each made false statements concerning the Company's abilities and had the opportunity to commit the

fraud alleged.

248.     Renewable Energy and the Individual Defendants had actual knowledge of the misrepresentations and/or omissions of material fact set forth herein or acted with reckless disregard for the truth in that they failed to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether the statements alleged herein, were false and/or misleading, or turned a blind eye toward the true facts that were available to them. The material misrepresentations and/or omissions of the Defendants in this Count were done knowingly or recklessly and for the purpose and effect of concealing the Company's true prospects from the investing public and supporting the artificially inflated price of Renewable Energy securities.

249.     As demonstrated by Renewable Energy and the Individual Defendants' misstatements and/or omissions of the Company's business, operations, financial well-being, and prospects throughout the Class Period, these Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading, or turning a blind eye toward the true facts that were available to them.

250.     As a result of the dissemination of the materially false and/or misleading information and failure to disclose material facts, as set forth herein, the market price of Renewable Energy securities was artificially inflated. In ignorance of the fact that market prices of Renewable Energy securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by these Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to, or recklessly disregarded, but these Defendants, but not disclosed in public statements by Defendants,

Plaintiff and the other Class members acquired Renewable Energy securities at artificially high prices and were, or will be, damaged thereby.

251.    At the time of said misrepresentation and omissions, Plaintiff and the other Class members were ignorant of their falsity and believed them to be true. Had Plaintiff and the other members of the Class, and the marketplace known the truth regarding the Company's business, which was not disclosed by Defendants, Plaintiff and the other members of the Class would not have purchased or acquired Renewable Energy securities, of if they had acquired such securities, they would not have done so at the artificially inflated prices that they paid.

252.    By virtue of the foregoing, the Defendants in this Count have violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

253.    As a direct and proximate result of Renewable Energy and the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchase or acquisition of Renewable Energy securities during the Class Period.

254.    This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchase of securities giving rise to the cause of action.

### COUNT II
### Violations of § 20(a) of the Exchange Act
### (Against the Individual Defendants)

255.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. As members of Renewable Energy's executive team and/or the Company's Board of Directors, the Individual Defendants acted as controlling persons of Renewable Energy within the meaning of § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

256.     By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of Renewable Energy's operations and/or intimate knowledge of the false information and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Renewable Energy, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. The Individual Defendants were provided with, or had unlimited access to Renewable Energy's reports, press releases, public filings and other statements, alleged by Plaintiff to have been misleading, prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

257.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control and/or influence the particular transactions giving rise to the securities violations, as alleged herein, and exercised the same.

258.     As set forth above, Renewable Energy and the Individual Defendants each violated § 10(b) and Rule 10b-5, promulgated thereunder, by their acts and omissions as alleged in this Complaint and the Class was damaged thereby. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act.

259.     As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchase or acquisition of Renewable Energy securities during the Class Period.

260.     This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchase of securities giving rise to the cause of action.

## XII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.      Declaring this action to be a proper class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) of the on behalf of the Class defined herein;

B.      Awarding Plaintiff and the members of the Class compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' conduct, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs; and

D.      Awarding such other equitable/injunctive or further relief as this Court may deem just and proper.

## XIII.   JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: July 9, 2021                           Respectfully Submitted,

**ROCHE FREEDMAN LLP**

*/s/ Ivy T. Ngo*
Ivy T. Ngo (*pro hac vice*)
Constantine P. Economides
Velvel (Devin) Freedman
200 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 971-5943
Emails:  ingo@rcfllp.com
            ceconomides@rcfllp.com
            vel@rcfllp.com

*Counsel for Lead Plaintiff Steven Rosa and*
*Proposed Lead Counsel for the Class*

**THE SCHALL LAW FIRM**
Brian Schall (*pro hac vice* forthcoming)
1880 Century Park East, Suite 404

90

Los Angeles, CA 90067
Telephone: (424) 303-1964
Email: brian@schallfirm.com

*Additional Counsel for Lead Plaintiff Steven Rosa*

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on July 9, 2021, I authorized the electronic

filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send

notification of such filing to counsel of record.

*/s/ Ivy T. Ngo*
Ivy T. Ngo